**UNITED STATES of America, Appellee,**

v.

**Gregory A. BASKIN, Appellant.**

**No. 88–3102.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 18, 1989.

Decided Sept. 22, 1989.

As Amended Sept. 22, 1989.

Virginia Veltrop, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief for appellee.

William J. Garber, Washington, D.C., for appellant Gregory A. Baskin.

Before MIKVA and WILLIAMS, Circuit Judges, and WILL,* Senior District Judge.

Opinion for the Court filed by Senior District Judge WILL.

WILL, Senior District Judge:

Gregory Baskin, defendant-appellant, was charged with unlawful possession with intent to distribute 500 grams or more of cocaine (Count I), in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(B)(ii)(II), and unlawful possession of marijuana (Count II), in violation of 21 U.S.C. § 844. A suppression hearing was held prior to trial and the defendant's motion was denied. Count II was dismissed at trial. The defendant was found guilty on Count I and sentenced to 262 months incarceration followed by five years supervised release. On appeal, the defendant contends that (1) physical evidence which was seized should have been suppressed, (2) certain expert testimony at trial should not have been admitted, (3) his tendered jury instruction on reasonable doubt was erroneously refused and (4) he was improperly sentenced under the Career Offender provisions of the Federal Sentencing Guidelines.

Based on the following analysis, the defendant's conviction is affirmed. However, we remand for reconsideration of the defendant's sentence and for resolution of the defendant's due process and eighth amendment challenges to the sentencing guidelines which were held in abeyance pending the Supreme Court's decision in *Mistretta v. United States*, — U.S. —, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The defendant also argued that the sentencing guidelines violated the separation of powers doctrine and were an excessive delegation of power to the Sentencing Commission. These arguments were rejected by the Court in *Mistretta* and are no longer raised by the defendant.

## I. BACKGROUND

At the suppression hearing, the government presented the testimony of Detective Floyd A. Johnston, a U.S. Park Police Officer assigned to the Drug Enforcement Task Force at Washington National Airport and Calvin Burns, an investigator assigned to the AMTRAK Police Narcotics Unit. Johnston and Burns were working with Detective Ed Curley, a dog handler with the Metropolitan Police Department, and a dog.

---

* The Honorable Hubert L. Will, of the United States District Court for the Northern District of Illinois, Eastern Division, is sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

Burns testified that he initiated the investigation on January 11, 1988 by reviewing manifests from trains originating in Miami, Florida. Burns noticed that a reservation had been made on January 7th under the name "G. Dawson" for one-way travel from Miami to Chicago, a call back number was given in Illinois and the ticket was purchased in cash ($189) nine minutes before the train's scheduled departure on January 11th. Burns called the Illinois number and heard a recording saying it had been disconnected. Burns arranged to meet Johnston, Curley and the dog at the Union Station in Washington, D.C. to investigate.

After the train arrived at the platform, Burns asked the train attendant to identify who had been sleeping in accommodation No. 21, presumably reserved for G. Dawson. The attendant pointed to the defendant who was carrying a brown bag. Burns followed the defendant up the escalator to where Johnston was waiting and he pointed the defendant out to Johnston. They both walked up to the defendant, Burns on his left and Johnston on his right. They were dressed in plain clothes and their weapons were not showing.

Both officers identified themselves and asked the defendant if they could talk to him. Both officers testified that the defendant responded by saying "sure." Burns asked to see the defendant's train ticket which he handed to him. It confirmed that he made a reservation in the name "G. Dawson." Burns handed the ticket back and asked the defendant for identification. The defendant said he had none but that he was Gregory Baskin and had been in Florida for a few weeks and was returning to Chicago.

Burns then told Baskin that he and Johnston were narcotics officers and asked if the dog could sniff his bag. Johnston testified that Baskin said he did not mind. Burns testified that he could not recall what Baskin's exact reply was but that he thought that Baskin said "sure, I don't mind." The two officers testified that they then asked Baskin if they could walk over to where Curley and the dog were, out of

the flow of traffic and he again said "sure." Baskin picked up his bag and the three men walked to Curley and the dog, approximately twenty to thirty feet away.

Baskin placed his bag on the floor and Burns picked it up and handed it to Curley for the dog to investigate. Johnston asked Baskin if he was carrying narcotics and, according to Burns, he said "no, you can look in there yourself if you want." By this time, the dog had indicated that narcotics were in the bag. Johnston told Curley that Baskin had given permission to search the bag and Curley responded "well, that's great because it has a very strong odor of narcotics."

Johnston picked up the bag and walked towards Baskin. He opened the bag and found packages containing "greenish stuff" and white powder. Baskin was placed under arrest and advised of his rights. The time between when Burns and Johnston identified themselves and the time Baskin was placed under arrest was estimated at four to five minutes. A rights card indicated that Baskin answered that he understood his rights but did not wish to talk then and wanted an attorney. The white powder tested positive for cocaine.

Baskin presented no evidence at the suppression hearing. He pointed out in cross-examining Johnston and Burns that neither of them ever told him that he did not have to talk to them, was free to walk away and did not have to consent to the dog's examination or the opening of his bag. He did not, however, dispute their testimony, including their recollections of his statements.

Baskin argued that he was stopped and detained at Union Station without reasonable or articulable suspicion of ongoing criminal activity and that any consent to the search was involuntary as a matter of law and as a product of his unlawful detention. The district court concluded that Baskin was not seized and that he had consented to the dog's sniff and the search of his bag. Baskin's motion to suppress was denied.

At the trial, the government presented the testimony of Johnston and Burns plus

that of George Griswald, a Forensic Chemist with the DEA, and Detective Dwight Rawls, a Metropolitan Police Department investigator. Essentially, Johnston and Burns repeated their testimony given at the suppression hearing. Griswald testified that the two packages of powder seized from Baskin's bag contained 638 grams of 98–99% pure cocaine.

Rawls testified as an expert in narcotics trafficking, over Baskin's objection. He explained how drugs are sold in large cities such as Chicago or Washington, D.C. Before trial, he called the DEA's office in Chicago to get price estimates for the drug market in Chicago. He had worked in Chicago in 1987. He also testified over objection that 99% pure cocaine sold for $100 per gram in Washington, D.C., although the purity level is generally 20–30%. He stated that 98–99% pure cocaine in Chicago sells for $95–100 per gram and the purity level is generally 50%. He added that dealers buying 99% pure cocaine "cut" the purity with substances such as sugar, 638 grams of 98–99% pure cocaine would sell for about $128,000 and a wholesale purchaser in Miami could buy the cocaine for $15,000 between January and March 1988.

Rawls further testified, over objection, that the cocaine could be converted to "crack." He also explained what a courier is. Baskin also objected to the use of a government diagram and the scope of the expert testimony. Finally, Rawls opined that it would be uncommon for a consumer to buy as much as 50 grams since that would be about 200 usages. The defense presented no evidence at trial.

## II. ANALYSIS

### A. *Suppression of Evidence*

■ The government admits that at the time the officers approached the defendant, identified themselves and asked him questions, they did not have probable cause to arrest him. In addition, the government states that we can assume that the police lacked articulable suspicion to stop the defendant when they accosted him. Instead, the government's theory throughout has

been and remains that the defendant was not "seized" until arrested after he had voluntarily consented to the search that yielded drugs.

Whether or not the defendant was seized depends on the totality of the circumstances. *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct.1975, 1979, 100 L.Ed.2d 565 (1988). "Only when the officer by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). The question becomes whether or not "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.) (footnote omitted).

According to the government, questioning the defendant was not a seizure because a reasonable person would have felt free to leave and the defendant later voluntarily consented to the search of his bag. The government claims that we need not decide whether the dog's signals gave the police probable cause to arrest the defendant and search his bag. The police officers admit that they did not tell the defendant prior to searching his bag that he did not have to talk to them, was free to leave and did not have to consent to the search.

In response, the defendant contends that inculpatory evidence was obtained following his "seizure" and "detention." According to the defendant, his interaction with the officers and the dog would have made a reasonable person in his position feel that he was not free to leave. The officers clearly approached the defendant intending to question him about narcotics and possibly to have the dog sniff the bag for drugs. However, the officers' state of mind is not in issue.

This court recently held that a seizure takes place when " 'a reasonable person would conclude from the circumstances, and the show of authority, that he was not free to leave the officer's presence,' considering factors such as visibility of weapons, physical intimidation, threats, or an un-

usual setting or time." *United States v. Lloyd*, 868 F.2d 447, 450 (D.C.Cir.1989) (quoting *United States v. Brady*, 842 F.2d 1313, 1314 (D.C.Cir.1988)). In *Lloyd*, the defendant was not seized at Union Station where the police approached him and

> politely asked him a series of questions, both detectives [were] dressed in plain clothes and displayed no aggressiveness (*e.g.*, neither made threats nor brandished weapons), and the encounter occurred outdoors.... [A]n officer's request for travel tickets, identification, or other information does not become a 'seizure' merely because the officer does not tell the person that he may refuse to answer the questions and is free to leave.

*Lloyd*, 868 F.2d at 451.

A distinction between *Lloyd* and our case is that the defendant in *Lloyd* walked away when the officers searched his bag and later voluntarily returned to the officers before he was arrested. This court noted that, even if the test were a subjective one, that this was evidence the defendant was free to leave. We do not believe that this is a material distinction between *Lloyd* and our case since there was no testimony that the defendant here was confined to a particular location. Instead, the evidence was that he voluntarily accompanied the police officers out of the flow of traffic and remained with them on his own volition.

As in *Lloyd*, the defendant here was approached by plain clothes officers who were not brandishing weapons or acting in threatening or intimidating ways. The defendant was politely asked questions, his train ticket was looked at but quickly returned and there is no suggestion that the time or setting was unusual. Moreover, his statements to the officers, which he did not refute, are consistent with a non-intimidating and non-threatening situation.

The defendant does not dispute the officers' testimony that he willingly consented to the questioning, dog's sniff and search. He instead relies on other facts which the court in *Lloyd* held do not constitute a seizure. A seizure does not exist just because the police officers do not tell the defendant that he does not have to talk to them or that he can walk away. *Lloyd*, 868 F.2d at 451. In sum, there was no Fourth Amendment violation.

As to whether or not the defendant consented to a search of his bag, *see, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), he only argues that any consent was tainted by an unlawful prior seizure but does not dispute that he consented to the search. Since we have already concluded that there was no seizure, the defendant's consent to the search was not tainted. Given the totality of the circumstances and the undisputed facts, the district court's conclusion that the defendant voluntarily consented is not clearly erroneous but instead, we believe, correct. *See Lloyd*, 868 F.2d at 451 (factual finding of consent is subject to clearly erroneous standard).

### B. *Expert Testimony*

The defendant argues that Detective Dwight Rawls should not have been able to testify as an expert about the purchase price and purity levels of cocaine in Miami and Chicago, or about crack and the term courier. The defendant objected on the grounds that there was no evidence of intended distribution in Washington, D.C. and that Rawls' testimony was prejudicial. The defendant also objected at trial to the government's use of a diagram but he has apparently waived this issue on appeal.

■ The defendant's argument that Rawls did not qualify as an expert is based solely on the fact that Rawls only learned about the facts of this case just before testifying. Whether or not one qualifies as an expert depends not on knowledge of facts of a particular case but on one's past experience with regard to the subject matter on which one will opine. Rawls could testify with no previous discussion about the facts of this case so long as his experience, which is not challenged by the defendant, is sufficient. In fact, he could have been given the facts of this case during his testimony and asked to render an opinion. Thus, the defendant's objection is without merit.

■ The defendant's other claims are essentially that evidence concerning crack and couriers was irrelevant and prejudicial. There was no evidence that the substance seized from the defendant was crack or that he would convert cocaine into crack. In addition, there was no evidence that the substance would be used or distributed in Washington, D.C.

We believe that Rawls' testimony reasonably aided the jury in resolving the factual issues and its admission was not an abuse of discretion. *See United States v. Anderson*, 851 F.2d 384, 392–93 (D.C.Cir. 1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 801, 102 L.Ed.2d 792 (1989). Count I charged the defendant with unlawful possession of 500 or more grams of cocaine with the intent to distribute. Thus, facts related to cocaine trafficking were relevant. We note that there was little if any connection between the charges against the defendant and the testimony about crack, a cocaine derivative. However, even if the admission of such irrelevant testimony was erroneous, we believe that it was harmless given the other overwhelming evidence.

C. *Jury Instruction*

■ The defendant requested that the jury be instructed that "a reasonable doubt can arise from the evidence *or lack of* evidence." The district court instructed the jury from the District of Columbia Standard (Criminal) Jury Instructions (3rd ed. 1978) that a reasonable doubt can arise from the evidence. The district court also instructed the jury that

> the burden is on the government to prove the defendant guilty beyond a reasonable doubt. This burden of proof never shifts throughout the trial; the law does not require a defendant to prove his innocence or to produce any evidence.

Based on these instructions, we believe that the jury was properly instructed on the issue of reasonable doubt and that the defendant's objection was properly overruled. In addition, the jury was instructed that it could convict for possession with intent to distribute as well as possession, the lesser included offense.

■ The defendant's main contention about the jury instructions seems to be based on venue. There was no direct evidence that the defendant intended to distribute cocaine in Washington, D.C. In addition, there was no evidence that the defendant would not have taken a connecting train to Chicago. The district court did not instruct the jury that both possession and intent to distribute must have been shown to occur in Washington, D.C.

However, venue was not in issue. "[S]ince possession with intent to distribute is a continuing offense, venue is proper wherever the crime takes place...." *United States v. Stitzer*, 785 F.2d 1506, 1519 (11th Cir.), *cert. denied, Perna v. United States*, 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 44 (1986). *See also United States v. Chappell*, 854 F.2d 190, 191–94 (7th Cir.1988); *Andrews v. United States*, 817 F.2d 1277, 1279–80 (7th Cir.), *cert. denied*, 484 U.S. 857, 108 S.Ct. 166, 98 L.Ed.2d 120 (1987) and 18 U.S.C. § 3237(a). It is clear that the defendant possessed the cocaine in Washington, D.C., among other places, and the quantity was consistent with an intent to distribute and not to consume. Thus, venue was proper in Washington, D.C.

D. *Sentencing Under The Guidelines*

■ The defendant claims that he should not have been designated a career offender under the sentencing guidelines. He was so designated based on two prior Illinois convictions—one for robbery and the other for armed violence. A career offender is one who is eighteen years or older, has been convicted of a felony that is either a crime of violence or a drug offense and who had been previously convicted of two felonies where each was either a "crime of violence" or a drug offense. 28 U.S.C. § 994(h). Career offenders are subject to sentences which are "at or near the maximum term authorized" under the guidelines. *Id.*

Neither of the defendant's prior felonies were drug offenses. Accordingly, he could only be designated a career offender if his two prior felony convictions were crimes of

violence. A crime of violence under the guidelines is defined as follows:

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16; Sentencing Guidelines 4B1.2(1).

The defendant admits that his prior felony for armed violence was a crime of violence but contends that he should not have been classified as a career offender because his other prior conviction for robbery is not considered a crime of violence under Illinois law. *People v. McCoy*, 63 Ill.2d 40, 344 N.E.2d 436, 438–39 (1976) (interpreting the Illinois Dangerous Drug Abuse Act). In contrast, *armed* robbery is defined under Illinois law as a crime of violence. *See also People v. Williams*, 138 Ill.App.3d 592, 93 Ill.Dec. 232, 233–34, 486 N.E.2d 333, 334–35 (1985) (interpreting Illinois Alcoholism and Substance Abuse Act). However, the Illinois Supreme Court noted in *McCoy* that while robbery is not classified as a crime of violence "it is undeniable that robbery does involve the use of or threat of force." 344 N.E.2d at 438 (citing ILL.REV.STAT. ch. 38, para. 18–1 (1973)). Thus, the Illinois statute *describes* robbery as a crime of violence consistent with the federal guidelines. 18 U.S.C. § 16(a). In addition, the commentary to the guidelines specifically includes robbery as a crime of violence. *See* Commentary Application Notes to Sentencing Guidelines 4B1.2(1) at 1.

■ In any event, the guidelines are a federal statute promulgated by the United States Sentencing Commission designed to be used by federal courts imposing sentences for persons convicted of federal crimes. *See Mistretta v. United States*, —— U.S. ——, 109 S.Ct. 647, 649–53, 102 L.Ed.2d 714 (1989). Thus, a crime is one of violence under § 16(a) if it is defined under state law as requiring proof of the requisite use of force (or attempted or threatened use of force), regardless of how the state may *characterize* the crime for purpose of its own multiple offender (or other) provisions.

A judge may depart from the guidelines, however, if there are factors in a particular case which were "not adequately taken into consideration by the Sentencing Commission in formulating the guidelines and that should result in a sentence different from that described." 18 U.S.C. § 3553(b). Judge Harris stated that "I tell you freely, I would give you a significant sentence if it weren't for the Guidelines, but I wouldn't give you the sentence I feel I have to." It appears that the particular facts of the defendant's previous conviction for robbery were not scrutinized by Judge Harris. He did not attempt to see whether or not departure from the guidelines was appropriate in light of any special mitigating aspects of the Illinois robbery and there was some question as to whether or not the facts of the defendant's robbery conviction made out a crime of violence. *Cf.* Sentencing Guidelines § 4A1.3 (allowing departure where information indicates that criminal history category does not adequately reflect seriousness of past conduct or risk that defendant will commit additional crimes). Classifying Baskin as a career offender based on statutory characterizations of his previous crimes may be improper if an analysis of the facts demonstrates that they were not in fact crimes of violence.

Judge Harris apparently believed that he did not have discretion to review the facts and depart from the guidelines but that if he could he would. A sentencing judge retains discretion to examine the facts of a predicate crime to determine whether it was a crime of violence notwithstanding the Commentary to the guidelines' predetermined list of crimes which it considers to be crimes of violence. Obviously, the guidelines' definitions, commentary and the like provide a solid starting point for determining whether a prior conviction was in fact a crime of violence. However, it may be appropriate, as provided by the guide-

lines, for a district judge to depart from the guidelines' statutory definition of a particular crime depending on the facts of the case. We remand for reconsideration of the defendant's previous robbery conviction to determine whether or not it was in fact a crime of violence under 18 U.S.C. § 16(a).

As to the question of whether or not robbery involves "a substantial risk" of violence to qualify as a predicate crime under 18 U.S.C. § 16(b), the defendant contends that this provision in the sentencing guidelines is void for vagueness. He contends that the line drawn between substantial risk and insubstantial risk must be clear and in its present form is subject to arbitrary distinctions. The government correctly notes, however, that we need not resolve this issue because the district court relied on 18 U.S.C. § 16(a). On remand, however, it may be necessary for the district court to determine whether or not the facts of the defendant's previous robbery conviction establish that it was a crime of violence under 18 U.S.C. § 16(b).

### E. *Constitutional Challenges to Sentencing Guidelines*

All of the defendant's challenges to the guidelines were held in abeyance pending the Supreme Court decision in *Mistretta v. United States*, —— U.S. ——, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The guidelines were upheld in *Mistretta* against challenges "that the Sentencing Commission was constituted in violation of the established doctrine of separation of powers, and that Congress delegated excessive authority to the Commission to structure the Guidelines." 109 S.Ct. at 653. We express no opinion on the merits of the defendant's due process and eighth amendment arguments not addressed by the Supreme Court and direct the district court to address the defendant's challenges which are now reviewable. Thereafter, the defendant (or the government) may bring an appeal from the district court's resolution of these issues.

### III. CONCLUSION

The district court properly denied the defendant's motion to suppress evidence, properly admitted expert testimony at trial and appropriately refused the defendant's tendered jury instruction on reasonable doubt. Accordingly, the defendant's conviction is affirmed.

However, we remand for reconsideration of the facts surrounding the defendant's previous state conviction for robbery to determine whether or not the facts of that crime constitute a "crime of violence," 18 U.S.C. § 16, necessitating the classification of the defendant as a career offender. We also remand for resolution of the defendant's due process and eighth amendment challenges to the sentencing guidelines which were held in abeyance pending the Supreme Court's decision in *Mistretta v. United States*, —— U.S. ——, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) and not addressed by the Court.

*Affirmed in part and remanded with instructions.*