### UNITED STATES of America

### v.

### William Joseph BUTLER, Appellant.

### No. 89–3187.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 13, 1990.

Decided Feb. 1, 1991.

Rehearing and Rehearing En Banc Denied April 4, 1991.

Mary E. Davis (appointed by the court), for appellant.

William C. Brown, Atty., Dept. of Justice, with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Helen M. Bollwerk and Merrick B. Garland, Asst. U.S. Attys., were on the brief, for appellee.

Before EDWARDS, BUCKLEY and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

HENDERSON, Circuit Judge:

William J. Butler appeals his convictions on two counts of possession with intent to distribute drugs and his sentences on those charges. Butler challenges his convictions on the grounds that (1) the prosecutor deprived Butler of due process by questioning him and commenting to the jury regarding his silence following arrest; (2) the government failed to provide records requested

pursuant to a valid subpoena; (3) the prosecutor impermissibly questioned Butler at trial regarding prior convictions; and (4) a portion of the judge's jury instructions prejudiced the jurors against Butler. In addition, Butler appeals his sentence asserting that the judge erroneously sentenced him as a "career offender" under the United States Sentencing Guidelines. Finding no merit in any of these contentions, we affirm Butler's convictions and sentences.

## I.

■ In deciding this appeal, we must view the evidence in the light most favorable to the government, allowing the government the benefit of all reasonable inferences that may be drawn from the evidence and permitting the jury to determine the weight and credibility of the evidence. *United States v. Sutton*, 801 F.2d 1346, 1358 (D.C.Cir.1986). So viewed, the evidence reveals the following material facts.

On April 3, 1989, Officer Glenn Giardino of the District of Columbia Metropolitan Police Department observed Butler, with whom he was acquainted, outside a convenience store on Alabama Avenue, S.E., in the District of Columbia. Recalling that he had seen Butler's name on a list of outstanding arrest warrants, Giardino approached Butler, informed him of the warrant and performed a "pat-down." Giardino discovered no weapons but did notice what "felt like large bags of candy" in Butler's jacket pockets. Giardino then led Butler into the store and was joined there by Officer James Carpenter who watched Butler while Giardino telephoned the warrant division to confirm that the warrant was still outstanding. Having received confirmation, Giardino arrested Butler and conducted a full search of his person, discovering a total of 152 grams of crack cocaine and 17 grams of cocaine powder in his jacket and pants pockets. Butler was then transported to the police station.

After being read his *Miranda* rights at the station by Officer Sean Rollins, Butler signed a document waiving those rights and agreed to speak. Rollins then asked him where he had obtained the drugs and Butler responded "From the dope boy." When Rollins asked the identity of the "dope boy," Butler hesitated, then requested to speak in private with Giardino. When the two were alone, Butler told Giardino "I was just getting ready to drop it off."

Butler was subsequently indicted on two counts: (1) possessing with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a), (b)(1)(C), and (2) possessing with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 841(a), (b)(1)(A)(iii).

On June 14, 1989, Butler was tried before a jury on both drug counts. Butler's defense was, as he testified on direct examination, that he had taken the cocaine from his young cousin, "Little Duck," on the day of his arrest and "was going around the store to take it to the police station" in order to "get even" with "Porky," the drug dealer from whom it had come. He further testified that, although he wanted to explain to Giardino at the time of his arrest why he had the drugs, he did not have the opportunity to do so:

Q ... Why did you sign you wanted to talk to the police?

A Because I wanted to talk to somebody about the incident.

Q And who did you want to talk to?

A I wanted to talk to Giardino because I knew him, and we have talked before to each other.

. . . . .

Q And when you asked to speak to Officer Giardino, what did you tell him?

A I couldn't really tell him nothing because I was trying to tell him what was happening, but he didn't want to hear it. He had already made up his mind. He didn't want to hear what I had said.

Q Did you tell him you were just getting ready to drop that off?

A Yes.

Q Did he believe you?

A No.

Q What did you decide to do at that point in time?

A Well, they wouldn't listen to me. I didn't want to say nothing else. I just wanted to get an attorney or lawyer or something like that.

Tr. I 128. The jury found Butler guilty on both counts and the judge sentenced him to concurrent prison terms of 240 and 360 months. Butler now appeals both his convictions and his sentences.

## II.

Butler first advances four arguments for reversal of his convictions. We find none of them persuasive.

■ Butler's principal argument is that the prosecutor improperly questioned him on cross-examination, and later commented in closing argument, regarding his silence after arrest, thereby depriving him of his right to due process under the fifth amendment. Because Butler failed to object to the references to silence in either the cross-examination or the closing argument, we review the prosecutor's conduct only for "plain error." *United States v. Zabalaga,* 834 F.2d 1062, 1066 (D.C.Cir.1987). We find no such error here.

During cross-examination, the prosecutor questioned Butler extensively concerning his failure to tell the police on the day of his arrest that he had intended to bring the drugs to the police station:

Q And when Giardino came back, you didn't say anything to him about the drugs, did you?

A Because when he was coming back, he was talking and telling me I had a warrant on me, and he slammed me up against the refrigerator. It was the coffee machine he slammed me up against, that real quick, and threw handcuffs on me, and searched my pockets.

Q But at no time prior to that did you say anything about the drugs, right?

. . . . .

Q Now, when you got back to the station, Officer Rollins came to you, right?

A True.

Q You did not tell Officer Rollins that you were bringing the drugs to the police department, did you?

A No.

Q And you didn't tell Officer Giardino ever that you were bringing the drugs to the police department, did you?

A When?

Q Ever? Ever?

A Yes, I told him that.

Q You told him—

A I was just about to drop the drugs off. To the police station.

Q Did you use the words "to the police station"?

A No.

Q You never used the words "to the police station"?

A No.

Q And you never explained to him that you got the drugs from Little Duck and you were trying to get even with Porky and that you were bringing the drugs in to give to the police, did you?

A After he tried to prove that it was mine, I just shut up and waited until I got attorneys. I could never talk to them, at no times talk to them. I couldn't talk to them in the police station because they were present with other policemen and I don't want to talk around them.

Q You did pull Giardino aside and you asked to talk to him by yourself, right?

A Yes.

Q And you didn't say those things when you talked to him by yourself, did you?

A No, I didn't say. He didn't pay no attention or listen to it then. He already made up his mind whoever you wanted to do it, so I shut my mouth.

Q You didn't say about bringing the stuff to the police station.

. . . . .

A You didn't tell him you were bringing the drugs to the police department, did you?

. . . . .

Q Did you?

A I mean, at the police station, no, I didn't.

Tr. I 147–50.

During closing argument, the prosecutor again focussed on Butler's failure to disclose to the police his claimed plans for the cocaine:

> No. He doesn't say a word about drugs. Not when he first sees Giardino, not when Giardino walks with him to the Seven–Eleven, and not while Giardino is making a phone call.
>
> Not a word to the other officer, Officer Carpenter, while they are waiting for Giardino to make a phone call, not when Giardino comes back from the call, not when Giardino says he is under arrest, not when Giardino puts him in cuffs, not even when Giardino begins searching him, and not even after Giardino finds the drugs.
>
> By Mr. Butler's own admission, not once at the Seven–Eleven does he say, "Gee, I was on my way to the police department, and here is the drugs, and they belong to Porkie."

> \* \* \* \* \* \*

Now we are at the police station. There Mr. Butler meets Officer Shawn Rollins. He testified there. He is a plainclothes officer. Rollins read him his rights. Rollins asked him whether he understood his rights. He said that he did, and he signed the waiver card. Then Mr. Rollins gives Butler an opportunity to talk. Now, does Butler say, "Okay, I just got the drugs from Porkie, and I was on my way to the police department, and I was going to drop them off, and there were a lot of juveniles"? No.

Rollins says, "Where did you get the drugs from?" And he says, "From the dope boy."

And Rollins asks, "Who is the dope boy?" And he doesn't tell him. Why doesn't he tell him? He says he doesn't trust him.

You saw Rollins on the stand. Did he offer any reason why you shouldn't trust Rollins? Does that make any sense?

He said he wanted to talk to Giardino alone. Why? Because he said he trusted Giardino.

> . . . . .

And what does he tell this trustworthy officer? Does he tell him he just ripped off a drug dealer? Does he tell him he was on the way to the police department? No, he doesn't. He says he knows the drugs are fifty-dollar bags, and he says he was just getting ready to drop the stuff off. Now what does it mean? The defendant claims it means he was just getting ready to drop the stuff off at the police department. Did he ever say that? No. He conceded on the stand that he never said that. He never said a word about just ripping off a drug dealer. Never said a word about dropping them off at the police department. Butler admits that. Use your common sense. Butler is not a secret agent who has to talk in code. He has just ripped off a drug dealer, if he is on the way to the police department, he can say it. He doesn't have to say one cryptic sentence and not say another word.

Tr. III 11, 12–14.

Butler argues that the prosecutor's extensive and repeated references to Butler's failure to explain to the police, after his arrest, that he had intended to deliver the drugs to the police station deprived him of due process under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).[1] In *Doyle*, the United States Supreme Court held that it is "fundamentally unfair and a deprivation of due process" to use a defendant's silence at the time of arrest and after receiving *Miranda* warnings to impeach his explanation at trial of incriminating evidence. 426 U.S. at 618–19, 96 S.Ct. at 2245. We perceive no due process violation under *Doyle* in the prosecutor's conduct here. In reaching this conclusion, we

---

**1.** Butler himself concedes the propriety of questions and comments regarding his silence before arrest, that is, during the time "when he first saw officer Giardino and when he was in the Seven–Eleven first with Giardino and later with Officer Carpenter." Brief for Appellant at 18 (citing *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980)).

consider separately the references to Butler's silence before and after he was advised of his *Miranda* rights.

First, the prosecutor's references to Butler's silence before he was advised of his rights cannot constitute a due process violation under *Doyle* because he had as yet received no assurance that his silence would not be used against him. The Supreme Court has "consistently explained *Doyle* as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him." *Fletcher v. Weir*, 455 U.S. 603, 606, 102 S.Ct. 1309, 1311, 71 L.Ed.2d 490 (1982). For this reason, the Court has stated: "In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to post-arrest silence when a defendant chooses to take the stand." *Id.* at 607, 102 S.Ct. at 1312. Up until the time he was read his *Miranda* rights, Butler received no affirmative governmental assurances concerning his silence on which he could rely.[2] The prosecutor's use of his silence during that period therefore cannot be described as "fundamentally unfair" so as to constitute a due process violation under *Doyle*.

We likewise find no due process violation in the prosecutor's questions and comments regarding Butler's silence after he was read and waived his *Miranda* rights. The prosecutor's references to Butler's silence were permissible because of Butler's claim on direct examination that he never had an opportunity to explain his circumstances to the police. Once Butler attempted to explain his silence, the prosecutor was free to discredit that explanation. *See United States v. Mavrick*, 601 F.2d 921, 933 (7th Cir.1979).[3] Further, insofar as the prosecutor's questions and comments related to Butler's failure to fully explain where he intended to "drop off" the drugs, they were outside the scope of the *Doyle* rule. In *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), the Supreme Court observed:

> *Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements the defendant has not remained silent at all.

447 U.S. at 408, 100 S.Ct. at 2182. So here, to the extent Butler waived his right to remain silent, he could not rely on the governmental assurances. The prosecutor was entitled to examine Butler regarding his ambiguous, if not inconsistent, statement to Giardino that at the time of his arrest he was about to "drop off" the drugs and neither the prosecutor's questions nor his comments on that subject resulted in fundamental unfairness to Butler. Butler's initial omission from his explanation of the pivotal fact that, as he claimed at trial, he intended to drop the drugs off *at the police station* is simply

---

**2.** Butler contends such an assurance can be inferred from the following testimony by Carpenter regarding Butler's actions while Giardino was on the telephone at the convenience store: "He stated the officer knows me in person. I told him that, to just wait until he gets finished. 'He says you have a traffic warrant, and if it is good, he confirms it, he is probably going to arrest you.'" We do not agree that Carpenter's statement could be reasonably interpreted as an assurance, even an implicit one, that Butler's silence would not be used against him.

**3.** The *Mavrick* court stated:

Having raised the question of opportunity to explain to police officers, [the defendant] 'opened the door to a full not just a selective development of that subject.' ... Here the defendant implied that had he been given the opportunity he would have explained his seemingly illegal conduct to those detaining him. Although the defendant's testimony would not permit the government to argue that his post-arrest silence was inconsistent with his claim of innocence, we hold it did permit the government to discredit his testimony by showing that he was given such an opportunity and did not take advantage of it. 601 F.2d at 921 (quoting *United States v. Fairchild*, 505 F.2d 1378, 1383 (5th Cir.1975)).

not the kind of "silence" protected under *Doyle*. *See Anderson*, 447 U.S. at 409, 100 S.Ct. at 2182 ("Each of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of 'silence'....").

Because we find no "plain error," we reject Butler's first ground for reversal of his convictions. The remaining three grounds can be summarily dismissed.

 Butler first asserts the trial judge erred in refusing to require that the government produce information pursuant to a subpoena. On June 12, 1989, two days before the trial was scheduled to begin, Butler served on the District of Columbia Police Department a subpoena seeking records showing whether Giardino was assigned to the warrant squad, as he maintained, on the day of Butler's arrest. Butler's counsel complained the first morning of trial that the police department had not complied with the subpoena and the judge ruled that service of the subpoena, which Butler's counsel admitted he intentionally delayed until two days before trial,[4] was "not reasonably made." We find no reversible error in this ruling. Matters of discovery are generally left to the trial judge's discretion and are reviewable only for abuse of discretion. *United States v. Yunis*, 867 F.2d 617, 622 (D.C.Cir.1989). Given the intentional delay in serving the subpoena and the absence of any apparent prejudice from the failure to comply,[5] we find no abuse of discretion in the judge's decision to proceed with the trial without requiring production of the requested material.

 Butler next contends the prosecutor improperly questioned him regarding two prior convictions. On direct examination, when asked by his lawyer about earlier convictions for attempted robbery and involuntary manslaughter, Butler described the robbery as follows: "I was shooting dice with a couple of friends and I snatched $20 and ran." Regarding his prison term for the manslaughter conviction, he commented: "[N]obody wants to be locked up for no reason at all." On cross-examination, the prosecutor, while consulting a police report, questioned Butler concerning some of the details of the previous convictions. We find no error in that inquiry. The prosecutor was entitled to impeach Butler's attempts on direct examination to minimize his previous misconduct. *See United States v. Perry*, 857 F.2d 1346, 1352–53 (9th Cir.1988); *United States v. Amahia*, 825 F.2d 177, 179–80 (8th Cir. 1987). Further, the record does not show, as Butler suggests, that the prosecutor read from the police report or that it was given to the jury.

 Finally, Butler alleges error in the following excerpt from the judge's instructions to the jury:

> Now, this next instruction goes to the question of whether you should be shocked by charges in the case. You may get, for instance, during the course of your service a gruesome murder case. Well, taking a human life is an important thing but you don't consider the nature of the charges in this, or any other case, in order to find out whether or not the man or woman is guilty. You are specifically cautioned against permitting the character of the charge itself to affect your minds in arriving at your verdict. You must permit only the evidence in this case to enter your deliberations and findings.

Butler contends the reference in this instruction to murder was reversible error because it "gave the appearance that the judge had formed an unfavorable opinion of the defendant because of his prior conviction" for manslaughter, presenting "an extreme danger that the jury considered factors not proper in the consideration of the evidence and were swayed by the ap-

---

4. The defendant's counsel informed the judge he had delayed serving the subpoena "for tactical reasons."

5. Butler's counsel admitted to the judge: "I am not expressing an opinion either way as to whether Officer Giardino works in warrants or not—but I feel that the record should be complete if I subpoena information."

pearance of partiality toward the prosecution" and rendering the trial "so unfair that the verdict cannot stand." We perceive no such danger here. The quoted language used an unrelated crime to illustrate factors which the jury was instructed *not* to consider. We cannot presume that the jury was thereby induced to do precisely the opposite and to consider improper matters. In addition, it seems improbable that the jurors would associate the hypothetical "gruesome murder" with Butler's previous manslaughter conviction, and there is nothing in the record to suggest that they did so. Accordingly, we reject this ground as well.

### III.

Next, we consider Butler's appeal of his sentence. The judge sentenced Butler to concurrent prison terms of 240 months for possession of the cocaine powder and 360 months for possession of the crack cocaine.[6] Butler asserts that in imposing these sentences the judge erred by (1) failing to consider departing from the sentencing guidelines on the ground of diminished capacity and (2) sentencing Butler as a "career offender" without considering the specific facts of his previous convictions. In reviewing Butler's sentences, we may consider only whether they were imposed in violation of law or as a result of an incorrect application of the sentencing guidelines. 18 U.S.C. § 3742(E); *United States v. Williams,* 891 F.2d 921, 923 (D.C. Cir.1989). Finding neither defect present here, we affirm Butler's sentences.

▪ First, Butler contends the judge should have considered a departure because Butler suffered "diminished capacity" as demonstrated by a psychologist's written evaluation that was submitted with the presentencing report. Specifically, Butler contends that the judge refused to consider a departure on this ground "because it was not (or could not be) raised as a defense at trial" and because he mistakenly believed that Congress had foreclosed

consideration of diminished capacity as a mitigating factor when it eliminated diminished capacity as an affirmative defense. Brief at 36–37. We disagree. The guidelines expressly authorize a departure for "significantly reduced mental capacity" but only if it does not result "from voluntary use of drugs or other intoxicants." U.S. Sentencing Guidelines § 5K2.13. The psychologist's letter expressly stated that Butler did not meet the guidelines criterion for reduced mental capacity and that "the most proximate cause for any 'reduced capacity' would have to be Mr. Butler's substance abuse." Relying on this language, the judge, in an order filed September 15, 1989, found that the psychologist's evaluation showed Butler did not suffer from such reduced mental capacity that warranted a departure under § 5K2.13 of the guidelines. Because that finding is supported by the evidence, we reject Butler's first challenge to his sentence.

▪ Nor do we find Butler's second ground, that the judge erred in sentencing him as a career offender, any more persuasive. A career offender is defined as a defendant, eighteen years or older, who is convicted of a felony that is either a crime of violence or a drug offense and who has previously been convicted of two or more felonies which are likewise either crimes of violence or drug offenses. 28 U.S.C. § 994(h); *see United States v. Baskin,* 886 F.2d 383, 388 (D.C.Cir.1989). A defendant found to be a career offender is subject to "a term of imprisonment at or near the maximum term authorized." 28 U.S.C. § 994(h); *see also Baskin,* 886 F.2d at 388. Relying on *Baskin, supra,* Butler asserts the judge improperly treated him as a career offender because (1) his prior conviction for robbery was not necessarily a crime of violence and (2) the judge failed to consider mitigating circumstances surrounding that offense in making the career offender determination. We find neither argument persuasive.

In *Baskin,* we remanded to the district court to reconsider its classification of the

---

6. The presentence report calculated an imprisonment range under the guidelines of 360 months to life. Presentence Report at 6.

defendant as a career offender because the judge, apparently believing he had no discretion to do so, did not scrutinize the facts of the defendant's prior robbery conviction to determine whether any mitigating aspects warranted departure from the guidelines and because there was some question whether the facts of the offense made out a crime of violence. *See Baskin*, 886 F.2d at 389. No such circumstances support remand here. In his September 15, 1989 order, the judge considered the circumstances of Butler's robbery conviction and concluded they did not justify a departure. While he did not expressly address the violent nature of the robbery conviction, the judge had before him, and examined, the facts of the offense and those facts fully support the conclusion that it was a crime of violence.[7]

For the preceding reasons, the judgment of the district court is in all respects

*Affirmed.*

---

**7.** The presence report sets forth the following description of the robbery:

On September 14, 1983, defendant wearing a ski mask, along with another man, robbed a man involved in a crap game ... by sticking a "hard" object in his mouth and grabbing $20 from his hand.

Presentence Report at 5.