**UNITED STATES of America, Appellant,**

v.

**William Roy ATKINS, Appellee.**

No. 95–3114.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 7, 1997.

Decided July 11, 1997.

Gregg A. Maisel, Assistant United States Attorney, Washington, DC, argued the cause for the appellant. Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, Washington, DC, were on briefs.

Gerald I. Fisher, Washington, DC, appointed by the court, argued the cause for the appellee.

Before SILBERMAN, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the court filed PER CURIAM.

Dissenting opinion filed by Circuit Judge KAREN LeCRAFT HENDERSON.

PER CURIAM:

The United States (Government) appeals the district court's decision to depart downward from the range specified in the United States Sentencing Guidelines (U.S.S.G. or Guidelines) to sentence William Atkins (Atkins) to five years of probation on his conviction of felon in possession of a firearm. Applying Guidelines section 5K2.13, the district court departed based on its finding that Atkins suffered from reduced mental capacity. We conclude that the district court's legal error requires vacatur and remand for resentencing.

## I.  FACTS

On March 18, 1992, District of Columbia police received a tip that Atkins, who was on escape status from federal custody, was spotted in The Guards restaurant in Georgetown. Several plain clothes officers entered the restaurant and approached Atkins. Whether they identified themselves as police officers first or instead shoved Atkins and attempted to arrest him without identifying themselves is disputed.[1] In either event, considerable effort was required to subdue Atkins. The police recovered a loaded .357 revolver from him.

As a result of the incident, Atkins was charged with one count of assault on a police officer while armed in violation of D.C.Code § 22–505(a) and (b), one count of felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g) and 924(e) and one count of felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g) and 924(e). Atkins pleaded guilty to the section 922(g) violation involving the firearm. The count alleging the D.C.Code violation as well as the remaining portions of the other two counts were dismissed. Pursuant to Guidelines section 5K2.13 (Diminished Capacity), the district court departed from the Guidelines range of 37 to 46 months' imprisonment and instead sentenced Atkins to five years' probation. In concluding that Atkins's criminal history did not indicate that incarceration was necessary to protect the public, the district court found the following: (1) Atkins's mental condition was treatable; (2) because of his uncompleted sentence, he would not be released from prison until his middle 50's;[2] (3) his record was based on an erroneous calculation of his criminal history score; and (4) he had never injured law enforcement officers despite repeated opportunities to do so.[3] Appellant's R. Material K.4.

Atkins served as a special forces captain in Vietnam, a Prince George's County, Maryland police officer, a military trainer and counter-terrorism consultant in Saudi Arabia and elsewhere and a mercenary with the Rhodesian Army. According to the psychologist whose report the district court relied upon, Atkins suffered from post-traumatic stress disorder (PTSD) and "survivor mode functioning" as a result of "his combat episodes and war trauma" in Vietnam. Appellant's R. Material F.7. In the psychologist's view, Atkins's condition compelled him to possess firearms.

Atkins's criminal history attests to his attachment to firearms; he has been convicted of firearms offenses at least four times. Atkins's previous offenses also involved assaults on or threats against law enforcement officers. After a December 1980 traffic accident in England, Atkins threatened another motorist with a .38 caliber handgun. Atkins fled the scene and, when cornered by two police officers, threatened to kill them and managed to take one of them hostage at gun point. After a November 1986 arrest for driving while intoxicated, Atkins freed him-

---

1. The district court credited the latter version of events at least to some extent. Appellant's R. Material I.13 (court observed Atkins, his wife and friends "were truly startled" and resistance was "understandable" reaction).

2. The Government characterizes this factor as two separate factors—Atkins's record and his age upon release—but it is clear from the district court's findings of fact that Atkins's record had no independent significance and was relevant only in relation to his age upon release. Appellant's R. Material K.4 ("Mr. Atkins must still serve the balance of an undischarged term of imprisonment of 94 months in an unrelated matter, and thus will not be released from prison for several years, at which time he will be in his middle 50's.").

3. The court adopted Atkins's proposed findings of fact.

self from handcuffs, recovered his loaded 9mm handgun, held the handgun at the arresting officer's side and said "Gotcha." In November 1988, Atkins reached for a .32 caliber revolver concealed at his ankle when stopped by agents of the Bureau of Alcohol, Tobacco and Firearms. In April 1990, Atkins was mistakenly released from the Federal Correctional Institute in Butner, North Carolina after completing his sentence for the 1986 offense but before he had served a 94–month consecutive sentence for the 1988 offense. Presentence Investigation Report at 6. Since his arrest in this case, Atkins has been serving the latter sentence.

## II. DISCUSSION

Section 5K2.13 authorizes a sentencing judge to grant a downward departure as follows:

> If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

U.S.S.G. § 5K2.13. The Government contends that the district court considered impermissible factors in deciding that Atkins's criminal history indicated no need for incarceration to protect the public.[4] Specifically, the Government argues that "criminal history" as defined in Chapter 4, Part A of the Guidelines is the only relevant factor in assessing whether a defendant poses a threat to public safety such that he should be imprisoned and that, even if a broader range of factors may be considered, the factors the district court considered were improper.

The defendant's criminal history is the only explicit criterion for determining whether the defendant's imprisonment is necessary to protect the public. And, as the Government observes, the United States Sentencing Commission (Commission) knows how to use

broader language when it so intends. *Cf.* U.S.S.G. § 5D1.3 (court is to evaluate defendant's "history and characteristics" in considering supervised release). Nevertheless, at least one court has held that whether a defendant must be incarcerated to protect the public can be determined only after a "precise and fact–specific" evaluation not limited to his "criminal history" as reflected by the numerical calculation laid out in Chapter 4, Part A. *United States v. Cantu*, 12 F.3d 1506, 1516 (9th Cir.1993). As the Ninth Circuit observed, "the purpose of this departure is lenity." *Id.* Chapter 4, Part A, on the other hand, recognizes that "[a] defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment" and that greater punishment for repeat offenders furthers deterrence of crimes. U.S.S.G. Ch. 4, Pt. A, intro. comment. In *United States v. Chatman*, 986 F.2d 1446 (D.C.Cir.1993), we analyzed whether section 5K2.13's "non-violent offense" language should be read as a contrapositive of section 4B1.2's definition of "crime of violence" and concluded that, in the absence of a cross–reference, the lenity factor undergirding section 5K2.13 suggests that the application of that section should not be controlled by section 4B1.2. *Chatman*, 986 F.2d at 1450–53. The different purposes behind section 5K2.13 and Chapter 4, Part A likewise suggest that the latter should not control the meaning of "criminal history" as used in the former.

Whether an individual such as Atkins is dangerous to the public turns, to some degree, on the circumstances of his mental disorder. Psychiatric treatment, for instance, may reduce the risk that the offender will continue to commit crimes that put the safety of others in jeopardy. Normally, of course, a pattern of past criminal activity warrants an inference that the offender is unlikely to mend his ways and therefore that incapacitation, *i.e.*, a long sentence, is the only effective means of safeguarding society. *See* U.S.S.G. Ch. 4, Pt. A, intro. comment ("To protect the public from further crimes

---

4. Although the Government contested other elements of a section 5K2.13 departure below (*e.g.*, whether the offense was non-violent), it has nar- rowed its focus on appeal to whether incarceration is needed to protect the public.

of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered."); *Chatman*, 986 F.2d at 1451. Here, Atkins's history is the history of a mentally ill criminal and therefore his sentence must reflect the extent to which that additional characteristic, together with those normally taken into consideration, may increase or decrease the likelihood that he will be a danger to society. *Cf. Chatman*, 986 F.2d at 1451–52 (purposes of just desert and deterrence that justify longer sentences and definition of "crime of violence" in U.S.S.G. § 4B1.2 lose some relevance in context of diminished mental capacity).

Moreover, the Commission could have provided that certain repeat offenders are ineligible for a departure under section 5K2.13. That it chose not to reinforces the view that "criminal history" means something more in section 5K2.13 than it does in Chapter 4, Part A. Section 5K2.13 might, for example, have provided that a defendant with a certain number of criminal history points as calculated pursuant to Chapter 4, Part A is not eligible for a downward departure under section 5K2.13. In that case, the sentencing court would simply do a little math to determine a defendant's eligibility for the departure; it would not have to assess the "need for incarceration to protect the public."

■ Indeed, the Government itself acknowledges that evaluating the factors identified in *Cantu* is a "common-sense approach" to determining whether the defendant should be imprisoned to protect the public. Appellant's Br. 21. Even more to the point, the Government concedes that " 'criminal history' as used in section 5K2.13 may have a broader meaning than the numerical 'criminal history category' calculated for a defendant under § 4A." Appellant's Reply Br. 7 n.4. We agree and conclude that the "criminal history" referred to in section 5K2.13 is not limited to the meaning Chapter 4, Part A gives it. This is not to say, however, that anything is fair game. Rather, the sentencing court may consider only those factors that bear on whether "the defendant's criminal history ... indicate[s] a need for incarceration to protect the public." U.S.S.G. § 5K2.13.

The Ninth Circuit identified four factors: psychiatric or other medical treatment the defendant is receiving and its likelihood of success, the defendant's likely circumstances upon release, the defendant's overall criminal record and the "nature and circumstances" of the current offense. *Cantu*, 12 F.3d at 1516.

■ The sentencing court here strayed far from these factors. In determining that Atkins did not pose a threat requiring imprisonment, the court first found that PTSD is a treatable disorder. Absent a finding that Atkins would in fact receive (or even seek) treatment, however, his condition's amenability to treatment has no relevance. *Cf. United States v. Webb*, 49 F.3d 636, 639 (10th Cir.) (evidence of mental disorder insufficient to justify downward departure if sentencing court does not explain disorder's significance), *cert. denied*, —— U.S. ——, 116 S.Ct. 121, 133 L.Ed.2d 71 (1995). Indeed, not only was there no indication that Atkins was receiving treatment that had some likelihood of success, *cf. Cantu*, 12 F.3d at 1516, Atkins previously had terminated court-ordered therapy, Presentence Investigation Report at 11. Without going further, *e.g.*, by finding that Atkins would receive treatment and that it had some chance of success, the district court improperly considered the theoretical treatability of Atkins's condition.

■ The district court next found that, because Atkins would be in his 50's when he completed his prior sentence, he was not likely to pose a threat when released. Because the defendant's criminal history involves the use and abuse of firearms, whose exercise requires no youthful vigor, his age on release is relevant only insofar as it points to a materially diminished *inclination* to commit such crimes. Although the historic fact that the young commit the overwhelming majority of crimes may support such a prediction, reliance on it under § 5K2.13 is undermined by the central role of reduced mental capacity, which suggests that the normally beneficent effects of aging may be ineffective. Further, the Guidelines indicate a general reluctance to place much weight on age. *See* § 5H1.1 ("Age ... is not ordinarily relevant in determining whether a sentence

should be outside the applicable guideline range.") Thus age would appear relevant only to the extent that, in combination with some reasonable prediction about the course of the mental ailment, it supports a prediction that there is no "need for incarceration to protect the public" from the sort of crimes that the defendant has shown some propensity to commit.

■ The district court also based the downward departure on a possible miscalculation in Atkins's prior sentence. We disagree that the alleged sentencing mistake was an appropriate fact for the district court to consider.[5] The remedy for an error occurring in a different court lies with that court or the appropriate appellate court, not collaterally with the district court. *Cf. Custis v. United States*, 511 U.S. 485, 497, 114 S.Ct. 1732, 1739, 128 L.Ed.2d 517 (1994) (no right under Armed Career Criminal Act or Constitution to challenge prior convictions during sentencing except on sixth amendment ground); *United States v. Mitchell*, 18 F.3d 1355, 1360 (7th Cir.) ("[W]e agree with the result reached by the First, Fourth, Sixth, Eighth, and Eleventh Circuits, and hold that a defendant may not collaterally attack his prior state convictions at sentencing unless that conviction is presumptively void ...." (footnote omitted)), *cert. denied*, 513 U.S. 1045, 115 S.Ct. 640, 130 L.Ed.2d 546 (1994). The district court thus should not have considered another court's alleged mistake in deciding whether Atkins's imprisonment was necessary to protect the public.

■ The district court found finally that, by not actually injuring law enforcement officers despite numerous opportunities to do so, Atkins demonstrated that he is not a threat to the public. Although the nature of Atkins's prior offenses may be a legitimate subject of inquiry bearing on whether Atkins's criminal history indicates "a need for incarceration to protect the public," U.S.S.G. § 5K2.13, the district court's assessment of that factor amounted to an abuse of discretion. It is undisputed that Atkins did not seriously injure or kill a law enforcement officer or bystander during any of his numerous arrests. Nevertheless, Atkins's pattern of violent resistance to arrest, hostage-taking and armed threats against law enforcement officers manifests that he should be incarcerated to protect the public, not the converse.[6] This, then, is that rare case in which the district court exceeded its discretion.[7]

■ Accordingly, while the district court was entitled to look beyond Atkins's criminal history score as calculated under Chapter 4, Part A of the Guidelines in assessing the need to incarcerate him, it both considered improper factors and abused its discretion with regard to the one legitimate factor it considered.[8] A district court's decision to depart from the Guidelines is due substantial deference and should be reversed only when the court abuses its discretion, *Koon v. United States*, ── U.S. ──, ────────, 116 S.Ct. 2035, 2046–47, 135 L.Ed.2d 392 (1996), but an error of law (here, considering improper factors) is an abuse of discretion "by definition," *id.* at ──, 116 S.Ct. at 2047. We therefore vacate Atkins's sentence and

5. Atkins asserts that the district court used the sentencing mistake to grant a separate departure under section 4A1.3 on the ground that Atkins's criminal history category over-represents the seriousness of his criminal history. His assertion is not borne out by the record. In its findings of fact, the court discussed the alleged sentencing error expressly and exclusively as a factor bearing on whether he posed a threat to the public if not imprisoned. Appellant's R. Material K.4.

6. No one suggests that threatening police officers does not implicate public safety.

7. Even were we to accept the district court's finding on the point, its consideration of the other factors we have discussed would require remand.

8. The Government also argues that, even if Atkins is eligible for a downward departure, the size of the departure—from the Guidelines range of 37 to 46 months' imprisonment to five years' probation—constitutes an abuse of discretion. Because of our resolution of the case, we need not reach the issue. For the purpose of remand, however, we note that a departure from the applicable Guidelines range must be supported by "specific reasons explaining the extent of [the] departure." *United States v. Perkins*, 963 F.2d 1523, 1528 (D.C.Cir.1992); *see also United States v. Molina*, 952 F.2d 514, 522 (D.C.Cir.1992) (extent of departure must be supported on "reasoned basis").

remand for resentencing consistent with this opinion.

*So ordered.*

KAREN LeCRAFT HENDERSON, Circuit Judge, dissenting:

I disagree with the majority's view of what a sentencing judge may consider when evaluating "criminal history" under section 5K2.13. I agree that "criminal history" is not simply the defendant's numerical score as calculated in accordance with Chapter 4, Part A of the Guidelines. I fail to see, however, how the defendant's circumstances upon release have anything to do with his "criminal history." Similarly, psychiatric or other medical treatment the defendant is receiving or will receive and the treatment's chance of success ordinarily have no connection to criminal history.[1] Although *United States v. Cantu*, 12 F.3d 1506, 1516 (9th Cir.1993), identifies these factors as relevant to whether a defendant's criminal history indicates a need for incarceration, they are inconsistent with the Ninth Circuit's own reasoning. *Cantu* describes section 5K2.13 as being motivated by the fact that, "[w]hen defendants with reduced mental capacity do not exhibit violent conduct, ... incapacitation is not such an important goal." *Id.* But Cantu's criminal record contained "four convictions for differing degrees of assault." *Id.* at 1515–16. Far from "presum[ing] that a defendant with reduced mental capacity is more dangerous than other offenders," *id.* at 1516, the sentencing court (and the circuit court, for that matter) had unequivocal proof that Cantu *had* exhibited violent conduct and thus that incapacitation *was* an important goal in his case. Regardless of treatment he might receive or his circumstances upon release, Cantu's record demonstrated a need for incarceration to protect the public—a conclusion the Ninth Circuit itself would have reached had it heeded its own words.

"Criminal history" comprises the defendant's record of offenses—no more, no less. When a term defined in one section is used identically in another, we cannot simply ignore the overlap. Section 5K2.13 uses "criminal history"—the same term used in Chapter 4, Part A to determine the defendant's location on the horizontal axis of the Guidelines' sentencing table. U.S.S.G. § 4A1.1. If the Commission did not intend Chapter 4, Part A's definition of "criminal history" to apply to the sentencing court's determination whether the defendant's incarceration is, based on his "criminal history," necessary to protect the public, it could easily have chosen a different term. *See, e.g., id.* § 5D1.3 (court is to evaluate defendant's "history and characteristics" in considering supervised release); *cf. United States v. Chatman*, 986 F.2d 1446, 1451 (D.C.Cir.1993) ("crime of violence" in section 4B1.2 is "distinctively crafted 'term of art'" and does not guide interpretation of "non-violent offense" in section 5K2.13).

Accordingly, a sentencing judge evaluating whether the defendant's "criminal history" indicates a need for incarceration to protect the public should look to how the defendant's past crimes are classified under Chapter 4, Part A—the Guidelines provisions covering "criminal history." Section 4A1.2(p) adopts section 4B1.2(1)'s definition of "crime of violence" for the purpose of determining the defendant's criminal history under section 4A1.1. U.S.S.G. § 4A1.2(p). Section 4B1.2(1) in turn defines "crime of violence" as a felony having "as an element the use, attempted use, or threatened use of physical force against the person of another" or burglary, arson or extortion involving explosives or "conduct that presents a serious potential risk of physical injury to another." *Id.* § 4B1.2(1). The Guidelines emphasize that the "conduct that presents a serious potential risk of physical injury to another" means *only* "the conduct set forth (*i.e., expressly charged*) in the count of which the defendant was convicted." *Id.* § 4B1.2 application n.2 (emphasis added). Application note 2 repeats: "[T]he conduct of which the defendant

---

1. Medical treatment might have some bearing on how the defendant's criminal history reflects on his dangerousness in an exceptional case. For example, treatment might be relevant in the case of a defendant whose past crimes occurred before treatment began and whose offense of conviction occurred during a temporary and singular lapse in that treatment.

*was convicted* is the focus of the inquiry." [2] *Id.* (emphasis added). Ignoring the directive, the majority today sanctions the examination of facts underlying the defendant's criminal record without regard to—indeed without knowing—whether the facts were part of the charged conduct.[3] This is in addition to its examination of facts unrelated even to "criminal history." The record, namely the presentence investigation report, does not reflect what conduct was "expressly charged" in Atkins's past crimes. Nevertheless Atkins's criminal history does include at least one offense—assault on a law enforcement officer—that, based on its elements alone, is indisputably violent.[4] Presentence Investigation Report at 7. In my view, a departure under section 5K2.13 is unauthorized.

In addition, I believe that Guidelines section 5H1.1 bars the district court from considering Atkins's age upon release under any theory. That section provides that age "is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range" but may become relevant "when the defendant is elderly and infirm." U.S.S.G. § 5H1.1. There is nothing so extraordinary about his being in his 50's when released that makes Atkins's age relevant to a departure decision. As the majority observes, neither Atkins's repeat offense—possession of a firearm by a felon—nor the use of a firearm requires "youthful vigor." Maj. op. at 1570. Moreover, Atkins cannot reasonably claim that he either is or at the time of his release will be elderly and infirm.

Accordingly, I respectfully dissent—I would remand with instructions to sentence Atkins within the applicable Guidelines range.[5]

---

**2.** "Expressly charged" conduct is plainly a narrower category of conduct than "relevant conduct," *i.e.,* "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant ... that occurred during the commission of the offense of conviction." U.S.S.G. § 1B1.3(a)(1); *see generally United States v. Valdez–Torres,* 108 F.3d 385, 387–88 (D.C.Cir.1997).

**3.** We have held that, in determining whether a past crime is a "crime of violence," the sentencing court may consider "the facts of the case." *United States v. Baskin,* 886 F.2d 383, 390 (D.C.Cir.1989); *see also United States v. Bradshaw,* 935 F.2d 295, 303 (D.C.Cir.1991). *Baskin,* however, was decided before the Commission amended the commentary by expressly limiting the sentencing court's review of the facts to "the conduct set forth (*i.e.,* expressly charged) in the count of which the defendant was convicted" and by emphasizing that "the conduct of which the defendant was convicted is the focus of inquiry." U.S.S.G.App. C, amend. 433 (amending U.S.S.G. § 4B1.2 application n.2). Curiously, although *Chatman* observes that section 4B1.2 and its commentary had been amended twice in the prior two years, *Chatman,* 986 F.2d at 1450, the opinion overlooks the effect of the amendments which seriously erode *Baskin's* authority.

*Id.* at 1453 n. 7. The majority in *Chatman* expressly disavows reliance on *Baskin, id.,* but Judge Ginsburg's concurrence explains that "the result in [*Chatman*] would not obtain if [*Baskin*] were not the law of this circuit." *Id.* at 1454 (Ginsburg, J., concurring). Accordingly, I question *Baskin's* continuing vitality. *Cf. id.* at 1455 (questioning *Baskin* on different ground).

**4.** Atkins's arrest in England also resulted in his conviction of, *inter alia,* common assault and using a firearm with the intent to resist arrest. Presentence Investigation Report at 8.

**5.** Atkins did not receive a two-level decrease in the base offense level for acceptance of responsibility even though he pleaded guilty in accordance with the plea bargain and "indicated through his attorney [that] he accepted responsibility for the offense of conviction." Presentence Investigation Report at 3. Although the probation officer did not recommend a downward adjustment on the ground that Atkins "declined to discuss the issue with the probation office," *id.,* it remains within the district court's discretion to grant the adjustment. *See* U.S.S.G. § 3E1.1(a); *id.* § 3E1.1 application n.5 ("The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility.").