**UNITED STATES of America,**

v.

**Denis M. NEILL, Defendant.**

**Crim. Action No. 95–0323–01 (JHG).**

United States District Court,
District of Columbia.

May 1, 1997.

John Martin, Bray, Joseph Martin Jones, Schwalb, Donnenfeld, Bray & Silbert, P.C., Washington, DC, for defendant.

Richard A. Poole, U.S. Department of Justice, Criminal Division, Fraud Section, John E. Sullivan, U.S. Department of Justice, Criminal Section, Tax Division, Washington, DC, for U.S.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Upon consideration of Defendant Denis M. Neill's Motion For a New Trial, the government's opposition thereto, the defendant's reply, and the record in this matter, the defendant's motion will be denied.

On March 10, 1997, a jury convicted Defendant Denis M. Neill of Count Six of the Indictment,[1] which alleged a violation of 26

---

1. Count Six alleged:

On or about April 2, 1990, within the District of Columbia, the defendant, DENIS M. NEILL, who maintained his principal place of business and bank accounts in the District of Columbia, did willfully make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the calendar year 1989, which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, which said income tax return he did not believe to be true and correct as to every material matter in that said return reported he did not have signature authority over any foreign bank accounts at any time during calendar year 1989, whereas, as DENIS M. NEILL then and there well knew and believed, during calendar year 1989 he did have signature authority over five foreign bank accounts, to wit: a bank account maintained in the names of Denis & Mary Neill at the Bank of Bermuda in Bermuda; two bank accounts maintained in the name of Warfield, Inc. at Lloyds Bank in London, England; and two bank accounts maintained in the name of Advanced Systems, Inc. at Lloyds Bank in London, England.

(Making and Subscribing a False Return, in violation of Title 26, United States Code, Section 7206(1)).

U.S.C. § 7206(1).[2] The jury acquitted the defendant of Counts One through Five. (Earlier, at the close of the government's case, the Court granted the defendant's motion pursuant to Fed.R.Crim.P. 29(a), dismissing Count Seven.) Immediately following the verdict, the Court denied the defendant's motion for judgment of acquittal and his renewed motion to dismiss due to prejudicial pre-indictment delay. *See* Trial Transcript ("TR") at 3582. Later, the Court denied the defendant's Motion for Judgment of Acquittal Notwithstanding the Verdict and For Dismissal, or, in the Alternative, For Reconsideration of the March 10, 1997 Order Denying Denis M. Neill's Renewed Motions for Judgment of Acquittal and for Dismissal. *See* Mem. Op. and Order (April 29, 1997).

In the instant motion, the defendant now asks this Court to grant him a new trial based on five grounds: (1) that the Court erred by refusing to take judicial notice of an amended tax return that the defense failed to introduce into evidence at trial; (2) that the Court's jury instructions were inconsistent with *Cheek v. United States,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991); (3) that the Court erroneously admitted the testimony of Elaine Shea; (4) that the government's arguments regarding funds in the Bermuda bank account were improper; and (5) that the defendant suffered prejudicial spillover from evidence admitted to prove the obstruction and conspiracy counts. For the reasons stated below, each argument is rejected.

**The Standard of Review**

 In considering a motion for a new trial, the Court "weighs the evidence and evaluates the witnesses' credibility and decides whether 'a serious miscarriage of justice may have occurred.'" *United States v. Rogers,* 918 F.2d 207, 213 (D.C.Cir.1990). Whether to grant a motion for a new trial is a decision committed to the Court's sound discretion. *United States v. Dale,* 991 F.2d 819, 838 (D.C.Cir.), *cert. denied,* 510 U.S. 1030, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993).

**2.** This provision provides, in relevant part, that "Any person who—willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written

**The defendant's second amended 1989 tax return.**

The defendant claims error where this Court denied his request to take judicial notice of the second amended 1989 tax return, which he did not introduce into evidence at trial. The defendant tendered his request for judicial notice while the jury was deliberating, which request was denied minutes before the jury returned its verdicts. The record unambiguously describes the events leading to the Court's decision to deny the defendant's request.

In this document-intensive case, Defendant Denis M. Neill introduced numerous exhibits during the government's case-in-chief On February 27, 1997, after both sides moved exhibits into evidence, *see* TR at 2901–03, the government rested. TR at 2904. As was his right, Defendant Denis M. Neill immediately rested. TR at 2905. On numerous instances and again before the Court instructed the jury, she cautioned the parties to confer with each other and the Courtroom Deputy Clerk regarding the "mass of exhibits" to ensure that all of their exhibits were assembled and ready for the jury. *See, e.g.,* TR at 3272–73; TR at 3366–67. The record makes abundantly clear that the admission of exhibits consumed a considerable portion of the Court's time and attention during this case as the parties frequently contested the admissibility of the "mass of exhibits." *See, e.g.,* TR at 102–59; 192–96; TR 202–18; TR at 368–88; TR at 575–586; TR at 281–301; TR at 2625–28; TR at 2810–18; Order of March 5, 1997 (Docket No. 219); Corrected Order of March 3, 1997 (Docket No. 218); Order of Feb. 27, 1997 (Docket No. 206); Order of Feb. 21, 1997 (Docket No. 196); Order of Feb. 13, 1997 (Docket No. 195); Order of Jan. 27, 1997 (Docket No. 176); Order of Jan. 27, 1997 (Docket No. 175); Order of Jan. 27, 1997 (Docket No. 174). Immediately prior to the Court's instructions to the jury, the following colloquy took place:

> declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter" is guilty of an offense against the United States.

Ms. Rogers: So, [based upon the parties' consent, GX] 39–1 is taken out and the government has gone through all of our exhibits. *They are correct* and we have gone through all of their exhibits and they reflect—

The Court: *You have gone through each other's exhibits and your own exhibits just to make sure they are correct too. Not only each to examine the other, but your own.*

Ms. Rogers: *Absolutely.*

The Court: *You are satisfied with that?*

Ms. Rogers: *Yes, Your Honor.*

The Court: Okay, fine, good. The charts are being turned away from the jury, however you're doing it, as long as it is away from the sight of the jury. Mr. Jones?

Mr. Jones: Your Honor, just to make sure our record is clear, do we have a blanket exception to the court's failure to instruct with regard to certain instructions that we submitted to the Court as well as—

The Court. Everything you ask me for, if I don't give it word for word—and this applies to the government too—word for word as you would have wanted to, it is an open door, as far as I'm concerned to the Court of Appeals and whatever invitation you want to exercise there, if appropriate.

TR at 3366–67 (emphasis added).[3]

The Court then instructed the jury. *See* TR at 3370. The jury began its deliberations at 4:13 p.m. that day, March 6, 1997. TR at 3432.

On the morning of March 7, 1997, the jury sent the Court a note—a commonplace event injury trials. The note stated "We would like to have the amendments for the 1989 taxes [sic] year." TR at 3447. The following colloquy occurred in Court:

The Court: Now, I believe I understand [the note], but—is it clear to everybody?

Mr. Jones: I believe those are the two amended returns.

The Court: I think it was August and September of 1991.

Mr. Jones: Yes, your honor.

The Court: Do you agree, Mr. Poole?

Mr. Poole: That sounds like what they are looking for.

The Court: Can we find the exhibit numbers? I believe one is 38–6. I just want to be absolutely accurate about this.

Mr. Poole: We believe the first one is Government 31–6[sic] and the second one isn't in evidence.

The Court: That is what it appears like. We are looking in the transcript now, and at the [courtroom] clerk's notations, and it does not look like it was—[the Court's Deputy Clerk] Mr. Wood doesn't have it as either identified or admitted.

TR at 3447–48.

After examining the transcript, at length, the defendant's counsel explained that the failure to introduce the second amended return was due to a clerical error:

Mr. Jones: That is very clear—it is very clear that it is a clerical error on our part. Because in the stipulation referred to, the other two amended—the second amended return in December of 1991, the witness testified about them extensively.

The Court: So it is not a clerical error on my clerk's part; correct?

Mr. Jones: Correct, it is not a clerical error on the clerk's part. It is a clerical error in terms of our office putting the witness exhibits together.[4]

The Court: However it happened, the fact is it is not in evidence; is that correct?

---

3. While Martha P. Rogers, Esq., appeared on behalf of co-defendant James P. Neill, the defendants earlier had advised the Court that they were presenting a joint defense. Additionally, it is significant to the Court that, during this colloquy regarding exhibits, none of Defendant Denis M. Neill's three counsel advised the Court that they took a position at odds with that expressed by Ms. Rogers regarding the correctness of the defense exhibits in preparation for sending those exhibits to the jury.

4. Mr. Jones later stated: "I, being the supervisor advising attorney, I being lead attorney, it was ultimately my responsibility to make sure that got done correctly; and if there was a clerical error, I should have found it. That's my error. I say that unequivocally and clearly. But that was the error, and herein lies the problem." TR at 3554.

Mr. Jones: That is correct.

TR at 3453–54.

The Court then proposed a response to the jury, to which the defendant, through counsel, agreed:

> The Court: Now let me write the specific response to their question. All right. How about saying something like this to the jury: You have all the exhibits which have been received in evidence. In specific response to your question——and it would be typed right below the question—— Exhibit 38–6 is the amended return filed in August of 1991 for the tax year 1989.
>
> Mr. Jones: That is fine.

TR at 3458 (the first response to the jury note was filed as Docket No. 224); *see also* TR at 3567.[5]

Approximately two hours later on that same Friday, defendant's counsel, Mr. Jones, requested to be heard by the Court, which the Court promptly accommodated. Having decided that he was dissatisfied with the earlier response to the jury (with which counsel and the defendant had earlier agreed), Defendant Denis M. Neill's counsel now requested that the Court send the jury a second response. Although it is highly unusual, if not unheard of, to respond twice to one jury note——particularly when there has been silence from the jury after receiving the

first response and no request whatsoever for clarification——under the circumstances, the Court reluctantly granted the defendant's request. After counsel for the defendant proposed the first paragraph to his requested second response to the jury note, which paragraph was accepted virtually (if not completely) verbatim by the Court, the defendant consented to the following note:

> To complete the answer provided you at 11:21 a.m. this date:
>
> Exhibit 38–6 is an amended return filed in August 1991 for the tax year 1989. There has been testimony that a second amended return was filed in 1991 for the tax year 1989. That second amended return is not an exhibit in evidence.
>
> It is undisputed that all of the amended returns were filed after Denis M. Neill's grand jury testimony on March 21, 1991.
>
> You are the sole judges of the facts and it is your recollection of the evidence that controls.

Time: 2:11 p.m.

March 7, 1997

//S//

JOYCE HENS GREEN

United States District Judge

Second Response to Jury Note (Docket No. 225); *see* TR at 3570 (Mar. 10, 1997).[6]

> The counsel had an opportunity to discuss the matters that would be in the note, to view the note when it was sent back in finality, to hear the Court before that orally explain what the Court intended to put in that note, and to consult with their respective clients as far as the defendants were concerned and they did, indeed, because I saw the heads get together, as I said earlier today, and discuss this matter. That note went back in.

TR at 3567–68 (Mar. 10, 1997).

5. The Court later described the chronology leading to this first response to the jury's note as follows:

> The record will also show that on the first full day of deliberation the jury, having commenced to deliberate on this case on March 6th and having an hour or two of deliberation, that date, commenced their deliberation on March 7th, Friday, with greater detail and deliberated for the day until we concluded our proceedings at 3:15, 3:30 on that day.
>
> At 10:15 in the morning we received a note from the jury which indicated they would like to have the amendments for the 1989 taxes years. Taxes is spelled T-A-X-E-S.
>
> The Court, after discussion with the counsel in open court, all of which is on record, except for the Court's observations of viewing what the parties were doing, returned to the jury the following response:
>
> "You have all the exhibits which have been received in evidence. In specific response to your question, Exhibit 38–6 is the amended return filed in August 1991 for the tax year 1989." I dated it. I signed it at 11:21 am. and it went back to the jury room.

6. The Court later described the chronology leading to the second response to the jury's note as follows:

> Approximately two hours later the Court was alerted that the defense counsel wished to see the Court in the courtroom and I assembled to hear what was to be said. Again, the matter was fully of record and the record will show exactly what was said and what was done.
>
> At that point counsel for the defendants importuned the Court to do more. I might say parenthetically I just recalled what I did say at the time of the first note, and I said things like

The jury deliberated the rest of that day, Friday, March 7th, and the Court then recessed until Monday, March 10th.

By fax to the Court on Sunday, March 9, 1997, the defendant requested yet another conference regarding the jury's note of March 7th, its sole communication to the Court. TR at 3547. When the Court received notice of such request at 8 a.m. on Monday, March 10th, a hearing was held at the earliest possible opportunity—at approximately 10:10 a.m. that morning—immediately following other scheduled matters on the Court's calendar (a sentencing and an important status conference on a criminal case awaiting trial). At the hearing and in his motion, the defendant requested that the Court take judicial notice of his second amended return and that "the Court admit the second amended return for calendar year 1989 (copy attached hereto) and provide the return to the jury for their deliberations." Defendants' Request that the Court take Judicial Notice of an Undisputed Fact and Provide the Same to the Jury for Deliberation ("Judicial Notice Motion") at 2 (March 10, 1997) (Docket No. 226); TR at 3548–52.

After hearing argument on the defendant's Judicial Notice Motion, the Court immediately denied the motion from the bench. The Court considered the scant case law offered by the defendant, ruling as follows:

> this do happen in a fast moving case and I said one other thing that escapes me for the moment, but the record will show what I said at that time.
>
> When I came back in the afternoon, 1:00 something in the afternoon, to respond to the importuning of counsel, counsel urged the Court to revise the answer that had been earlier left with the jury as they were continuing in their deliberations, and the record should show as far as we know the jury continued to deliberate since they were in a locked room for much of that time save for the luncheon period which was one hour.
>
> The counsel urged the Court to put in the following: that Exhibit 38–6 is an amended return filed in August 1991 for the tax return [for year] 1989, to indicate that there was testimony that a second amended return was not filed in 1991 and that that amended return is not an exhibit in evidence. Counsel asked me to say it that way, and I repeat, that second amended return is not an exhibit in evidence.
>
> The Government opposed it but said if the Court were to do that they would ask that

Our case is different. And in our case we know that we never had this matter offered or received in evidence. That there were opportunities to do so. There weren't only the opportunities that the Government counsel has just now mentioned when the defendants could have produced that in evidence should they have chosen to do so, should they have remembered to do so. We have had a number of unusual things in this case. We have had daily transcript copy. We have had the opportunity for counsel to examine these things day after day after day to see what was in the record and what was not in the record.

The Court on at least two occasions, and the most recent being just towards the end of the case but not before the case was completed and not before the arguments were completed, once again, told counsel, and that was at least the second time, go over the exhibits, go over the exhibits, I want to make certain that everything is absolutely perfect with the exhibits that are being sent into evidence.

\* \* \* \* \* \*

So, one, I am not even certain this would be the kind of case that it would be appropriate to give judicial notice of an exhibit that was not offered in evidence, was not

> there be a phrase added which was something to the effect it is undisputed that all of the amended returns were filed after Mr. Denis Neill's grand jury testimony on March 21, 1991.
>
> The defendants also asked that I add a final paragraph. You are the sole judges of the facts and it is your recollection of the evidence that controls.
>
> At the end of this, turning to Mr. Jones, who was arguing the matter on behalf of the defendants and in particular Mr. Denis Neill, I asked if Mr. Jones could accept the phrase that the Government had posed alternatively, if I didn't accept their straight out opposition to the matter. Mr. Jones said something to the effect, I guess we can, and I said that's not good enough for the record. And Mr. Jones said, yes, we can and [he had] a brief colloquy with Mr. Denis Neill.
>
> The Court sent back the [second] note then to the jury.

TR at 3568–69.

received in evidence but one about which there was substantial testimony and one which is important to both people in the case, but from different viewpoints.

The Government did put in the first amended return. The second, there was an opportunity to put it in by both sides. Neither side put it in and we, of course, know the defendants elected not to put on a defense, and it is absolutely their right under the law. I want the record to show that and I not only believe that fervently, but I told the jury that over and again.

I have answered the question that the jury had asked. The first time would have been full enough. I answered it and I wonder how many other judges would have answered it the second time. But I did.

And in the interests of justice, while I was not enthusiastic about sending back yet another note to the jury, I listened to what both sides said, and I decided to do it in that manner. That was at some violence to my own personal judgment in this regard, but I balanced and let it go in.

The next matter and final matter is I find it would, indeed, be highly prejudicial to the Government were I to grant the motion that counsel is asking me to do at this time. The Government also—and this is my job—also has a right to have a fair trial[7] just as do the defendants. Both of those are my job and that's why maybe we don't call upon counsel to make these decisions on their own.

But if that exhibit had come into evidence, none of us will ever know what would have happened, would the Government have been silent or would it have examined. It says it would have examined. I have no reason to doubt it would have examined.

Under the circumstances, I cannot grant the motion. I do not believe that it would be appropriate to, once again, open up the

record. We have already told the jury beyond what we had to tell the jury and I am going to leave it at that.

TR at 3573–76.

As the Court returned to Chambers after the colloquy described above, the Deputy U.S. Marshall handed her a note from the jury, which stated: "We, the jury, have reached a verdict." TR at 3578. The Court immediately returned to the bench and advised the defendants and counsel as follows:

I might say there would not have been time to even have drafted a ruling on the matter I had addressed earlier with counsel this morning if it had been otherwise, because I had just stepped into my chambers when I was handed a note that was timed 10:45, received by the Marshal, and it says, "We, the jury, have reached a verdict."

TR at 3577–78.

The jury then rendered its verdicts, acquitting the defendant of all counts but one (Count Six) and acquitting his codefendant brother of all counts. TR at 3577–81.

▮ In his instant motion, the defendant covers the same ground all over again. While the plain language of Fed.R.Evid. 201 does provide that a Court shall take judicial notice of a fact capable of "accurate and ready determination by resort to sources[8] whose accuracy cannot reasonably be questioned," the purpose of this provision is not to provide an escape hatch for counsel's errors or to offer a strategic mechanism for a defendant to re-open the record after the jury begins to deliberate. The defendant offered substantial testimony at trial regarding the existence of, and circumstances relating to, the second amended 1989 tax return. *See* TR at 3456. That evidence was subject to cross-examination, was part of counsels' closing arguments, and it was properly before the jury. The second amended return

---

7. While the defendant and the government both have the right to expect fair and evenhanded treatment by the courts, as each side received in this case, the defendant's right to a fair trial is of course based on the Constitution and the government's is not.

8. "Representative authoritative sources for verification include such reference materials as historical works, science and art books, language and medical journals and dictionaries, calendars, encyclopedias, commercial lists and directories, maps and charts, statutes and legislative reports." Weissenberger's Federal Evidence: 1996 Courtroom Manual 24 (1995).

for 1989 was not even offered into evidence during the trial, and the government's relevancy objection thereto never became ripe during trial. *See* TR at 3456.

■ Judicial notice is a process by which a court takes recognition of a fact in the absence of formal proof: it is not a mechanism by which a party may avoid timely and proper objections to evidence that is reasonably available and, which, but for counsel's error, would be subject to introduction and consideration through the normal evidentiary mode. Even were judicial notice were appropriate under these circumstances and at this stage of the case, the defendant's request was untimely. Had the Court granted the request, as the record makes clear, the jury had concluded its deliberations before a response could have been crafted, considered and debated by the parties, and then prepared for the jury's consideration.

For the reasons stated above, the defendant's argument is rejected.

**The jury instructions.**

■ Next, the defendant challenges the jury instructions related to "good faith," contending that the Court's instructions were in conflict with *Cheek v. United States,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). In reviewing jury instructions for error, the Court considers "whether, taken as a whole, they accurately state the governing law and provide the jury with sufficient understanding of the issues and applicable standards." *United States v. Washington,* 106 F.3d 983, 1002 (D.C.Cir.1997). In this case, contrary to the defendant's claim, the Court considered *Cheek* and issued instructions fully consistent with its command.

*Cheek* holds that a defendant is not required to have been objectively reasonable in his misunderstanding of his legal duties or in his subjective belief that he acted in compliance with the law. 498 U.S. at 203, 111 S.Ct. at 611. In *Cheek,* the Supreme Court determined that it was error to instruct the jury that "an honest but unreasonable belief is not a defense and does not negate willfulness." *Id.* at 197, 111 S.Ct. at 608. *Cheek* does not,

however, prevent the jury from assessing the reasonableness of the defendant's belief as one factor in assessing the honesty of his beliefs, *id.* at 203–04, 111 S.Ct. at 611–12; *see, e.g., United States v. Grunewald,* 987 F.2d 531, 536 (8th Cir.1993), and it "does not mandate the use of the word 'subjective' or words 'subjective standard.'" *United States v. Hauert,* 40 F.3d 197, 202 (7th Cir.1994), *cert. denied,* 514 U.S. 1095, 115 S.Ct. 1822, 131 L.Ed.2d 744 (1995).

■ In this case, the Court's instructions accurately explained the issues of good faith and willfulness to the jury, and they did not in any way suggest or imply that a genuinely held good faith belief must also be objectively reasonable to negate willfulness. Instead, the Court's instructions made it clear that the jury must acquit if it believed the defendant acted in good faith. After considering the parties' submissions and in light of the Supreme Court's command in *Cheek,* the Court gave the following instruction:

The good faith of the defendants is a complete defense to the charges in counts 2, 3, 4, 5 and 6 of the indictment because good faith is simply inconsistent with willfully filing a false or fraudulent tax return or with willfully attempting to evade or defeat any tax.

Now, while the term good faith has no precise definition, it does mean, among other things, *an honest belief,* a lack of malice in the intent to perform all lawful obligations. *A person who acts on a belief or on an opinion honestly held is not punishable under these statutes merely because that honest belief turns out to be incorrect or wrong.* The tax laws subject to criminal punishment only those persons who willfully attempt to evade or defeat the tax or who file a fraudulent tax return.

If a person acts without reasonable grounds for belief that his conduct is lawful, it is for the jury to decide whether that person has acted in good faith in order to comply with the law or whether that person has willfully attempted to evade or defeat the tax or willfully filed a fraudulent return.[9] A person who believes that his

---

**9.** While ignoring the instruction as a whole, the defendant focuses his attack on this sentence.

---

**447**

tax return truthfully reports the taxable income and allowable deductions under the tax law acts in good faith and cannot be found guilty of willfully filing a false return or of willfully attempting to evade tax as charged in the indictment.

In determining then, whether or not the government has proven that the defendant willfully attempted to evade or defeat a tax or willfully filed a fraudulent tax return or whether the defendant acted in good faith, the jury must consider all of the evidence received in the case, bearing on each of the defendant[s'] state of mind. The burden of proving good faith does not rest with the defendants, because the defendants have no obligation to prove anything to you. The government has the burden of proving to you beyond a reasonable doubt that each defendant acted willfully as to those counts that I have noted.

If the evidence in the case leaves the jury with a reasonable doubt as to whether or not the defendants acted willfully, the jury must then acquit that defendant on that count or counts of counts 2 through 6 in which it finds that a defendant did not act willfully. If, however, the evidence in the case persuades you that each defendant did not act in good faith or either of them and you find that the government has proven each of the essential elements of counts 2 through 6, inclusive, beyond a reasonable doubt, then it is your duty to find that defendant or defendants guilty of the count or counts that apply to him as charged, pursuant to the indictment.

TR at 3419–21 (emphasis added).

■ Contrary to the defendant's argument, these instructions do not direct the jury to convict if they find the defendant's belief to be unreasonable. Rather, consistent with *Cheek*, the instructions make clear that the jury is to consider all of the evidence bearing on the defendant's state of mind. *See* 498 U.S. at 203, 111 S.Ct. at 611. The instructions given here simply allowed the jury to consider "the reasonableness of the

defendant's asserted beliefs in determining whether the belief was honestly or genuinely held." *Grunewald*, 987 F.2d at 536. "Of course, the more unreasonable the asserted beliefs or misunderstandings are, the more likely the jury will consider them to be nothing more than simple disagreement with known legal duties imposed by the tax laws." *Cheek*, 498 U.S. at 203–04, 111 S.Ct. at 611–12.

The defendant's reliance on *United States v. Powell*, 955 F.2d 1206 (9th Cir.1992) is misplaced. *Powell* is simply unpersuasive and easily distinguished because the jury instructions in *Powell* lacked the key instructions given here. In *United States v. Hirschfeld*, 964 F.2d 318 (4th Cir.1992), *cert. denied*, 506 U.S. 1087, 113 S.Ct. 1067, 122 L.Ed.2d 371 (1993), the U.S. Court of Appeals for the Fourth Circuit upheld jury instructions that were virtually identical to those in this case and rejected defense arguments based on *Powell:*

> While there is language in the district court's instruction that is similar to the inadequate instruction given in *Powell*, the instructions in *Powell* did not include the elaborate discussion about when a person acts in good faith. For instance, *Powell* did not contain the phrase, included by the district court here, "A person who acts on a belief or on an opinion honestly held is not punishable under the law merely because that honest belief turns out to be wrong." We believe that the district court's later use of the word "reasonable" was not used to define "good faith," but rather to introduce the circumstances under which the jury would have to determine whether subjective good faith is to be applied.

964 F.2d at 323.

■ As in *Hirschfeld*, this Court instructed the jury that "[a] person who acts on a belief or on an opinion honestly held is not punishable under these statutes merely be-

---

Contrary to his contention, this sentence is fully consistent with *Cheek* and virtually identical language has been upheld where the instruction includes an elaborate discussion of good faith, *see United States v. Hirschfeld*, 964 F.2d 318, 323

(4th Cir.1992), *cert. denied*, 506 U.S. 1087, 113 S.Ct. 1067, 122 L.Ed.2d 371 (1993), as did this Court's instruction. The defendant's attempt to distinguish *Hirschfeld* is not persuasive.

cause that honest belief turns out to be incorrect or wrong." TR at 3420.[10] Significantly, the "good faith" instruction applied to Counts Two, Three, Four, Five and Six, and the defendant was acquitted of four of these five counts. This indicates not that the jury was confused, but that it applied the evidence to each count separately. A jury is presumed to follow a court's instructions, and the defendant has not shown that this jury did otherwise. On Count Six, the jury simply rejected his claim of a "good faith" mistake.

In sum, the Court's instructions were fully consistent with the law, and the jury's verdict was supported by sufficient evidence that the defendant did not act in good faith. The defendant's argument is rejected.

### The testimony of Elaine Shea.

Next, the defendant finds error in the admission of the testimony of Elaine Shea and contends that the government's closing argument was improper. *See* Motion for a New Trial at 18–28; Reply at 15 n. 5. Ms. Shea was Defendant Denis M. Neill's secretary from September 1981 until June of 1986. TR at 816. As Neill's secretary, she performed a variety of duties, including "bookkeeping, secretarial work, billing clients, just keeping track of monies, depositing monies, writing out checks, and general secretarial work."

TR at 817. She was not employed by the defendant when he filed his 1989 tax return or when he filed the 1989 amended returns after the defendant testified before the grand jury in 1991.

At trial, Shea offered contradictory testimony regarding the Panamanian corporation Advanced Systems, Inc., over which the defendant was authorized to exercise signature authority. TR at 814; GX 6–31.[11] (Of the five foreign bank accounts which the Indictment alleged in Count Six that the defendant failed to disclose in his 1989 tax return, two were maintained in the name of Advanced Systems, Inc., at Lloyds Bank in London, England.). Shea was called by the government to testify on direct regarding her responsibilities in paying invoices as an employee of the defendant, that the defendant did business with the attorneys in Panama who constituted the Board of Directors of Advanced Systems, Inc., and that the defendant maintained certain corporate minute books behind his desk, including that of Advanced Systems, Inc. TR at 812.

Prior to Shea taking the stand, the defendant objected to admission of Shea's testimony regarding Advanced Systems, Inc., contending that she had no personal knowledge regarding Advanced Systems, Inc.[12] After

10. Similarly unpersuasive is the defendant's claim that the Court's instruction on willfulness violated *Cheek's* command: "To act voluntarily and deliberately and intending to violate a known legal duty. Negligent conduct is not sufficient to constitute willfulness." *Compare* TR at 3417–18 *with Cheek*, 498 U.S. at 201, 111 S.Ct. at 610. This instruction, particularly in light of the instructions given by the Court (and quoted *supra*) does not, as the defendant now claims, allow for the jury to conclude that a genuinely held. but wrong, belief constitutes willfulness. The defendants are entitled to instructions that accurately state the law; they are not entitled to every word or phrase that they propose, particularly when those words or phrases encourage verbosity or ambiguity instead of clarity. *See, e.g.,* Defendants' Proposed Jury Instructions at 57–60.

11. This exhibit stated, in relevant part, "THAT any one of the following persons be and he is hereby designated Authorized Signatories for and on behalf of [Advanced Systems, Inc.]:
 Mr. Denis M. Neill
 Mrs. Mary K. Neill
 Mr. James P. Neill."

Minutes of the Board of Directors of Advanced Systems, Inc. at 1 (July 4, 1986).

12. In his Motion for a New Trial, the defendant contends that he objected to Shea's testimony months before trial. *See* Motion for New Trial at 18 (citing Defendant Denis M. Neill's Reply Concerning his Motion in Limine, or in the Alternative, for Disclosure of Evidence of Foreign Arms Sales) (May 31, 1996) (filed under seal) ("Motion in Limine"). While the Motion in Limine challenged the basis for Elaine Shea's statement to government agents that the defendant set up Advanced Systems for himself, that motion cannot reasonably be construed as an objection to her testimony at trial. In the Motion in Limine, the defendant sought to preclude evidence of foreign arms sales or, in the alternative, to obtain discovery of certain classified information within the government's control. However, the specific relief of precluding Shea's testimony on Advanced Systems was never sought, and the record makes clear that, for reasons other than Elaine Shea's purported lack of knowledge regarding Advanced Systems, the Court granted the defendant's motion, providing him with the specific relief he sought—that is the preclusion of

government counsel stated that he did not intend to elicit opinion evidence from Shea regarding the "statement that Denis Neill set up Advanced Systems for himself," TR at 812, Shea was allowed to testify. On direct, the government counsel remained true to his representation. However, the government did establish through Shea's testimony on direct that the defendant did business with Arias, Fabrega & Fabrega, TR at 818, the attorneys in Panama who served on the Board of Directors of Advanced Systems. *See* GX 6–31. With respect to Advanced Systems and in testimony that she would later abandon, Shea testified on direct that she did not know whether it was set up for any of the defendant's clients. TR at 821.[13]

On cross-examination, the defendant's counsel asked the following questions:

> Q: (Mr. Jones) And you don't know when [Advanced Systems] was set up *or why it was set up;* is that right, ma'am?
>
> A: (Ms. Shea) That's correct.
>
> * * * * * *
>
> Q: All right. And do you recall ever discussing Advanced Systems with Mr. Neill *or any other party?*
>
> A: No.

TR at 828–29 (emphasis added).

On redirect, the government counsel elicited from Shea testimony that was not only at odds with her direct and testimony on cross-examination, but which was inconsistent with a prior statement made to FBI Special Agent Phyllis Sciacca:

> Q: (Mr. Sullivan) Which client did Denis Neill set up Advanced Systems for?
>
> A: (Ms. Shea) Kamel Fattah.
>
> Q: Your answer is Kamel Fattah?
>
> A: Right.

evidence of the defendant's personal involvement in foreign arms sales. *See* Mem. Op. and Order at 6–7 (Sept. 23, 1996) (Docket No. 104).

**13.** The following colloquy is relevant:
Q: (Mr. Sullivan) Do you know whether or not Advanced Systems was set up for any clients of Neill and Company, or Denis Neill, P.C.?

> Q: Do you remember being interviewed by Special Agent Phyllis Sciacca on June 23, 1994?
>
> A: Yes.
>
> Q: And did you tell her that Denis Neill set up a corporation called Advanced Systems for himself?
>
> A: Yes.

TR at 832.

The defense objected and moved to strike, but the Court overruled the objection. The following colloquy took place:

> Mr. Jones: Your Honor, that was the very question that Mr. Sullivan said he would not ask, and the very answer that he said he would not elicit from the witness. That's the very question and the very answer. I did not come anywhere within a hundred miles of that subject matter on cross-examination, and that Mr. Sullivan asked the question, I move that it be stricken.
>
> Mr. Sullivan: Your Honor, he opened the door. He asked questions about her knowledge of why Advanced Systems was set up, which client. I just asked the question, "Well, which client did Mr. Neill set up Advanced Systems for," and she said, "Kamel Fattah." I was shocked because there's a memo of interview with the F.B.I. where she says something totally inconsistent, right down here (indicating). So under 607, I just impeached her with a prior inconsistent statement.
>
> Mr. Jones: Your Honor, all I did was elicit her lack of information. That's all I did. I move to strike.
>
> The Court: Well, she has said she doesn't recall discussions about Advanced Systems with Neill or anyone. Now, you obviously had a prior inconsistent statement, and

A: No, I do not.
Q: You don't recall or you—do you know whether or not there were any clients involved with Advanced Systems?
A: There were not any clients involved with Advanced Systems of Neill and Companies.
TR at 821.

that is what she said on cross-examination. I'm not going to strike it.

TR at 832–33.

This Court ruled that Shea's prior inconsistent statement that Defendant Denis M. Neill set up Advanced Systems for himself could not be used as substantive evidence, *see* Order at 2–3 (March 3, 1997) (Docket No. 216), and instructed the jury accordingly. *See* TR at 3387–86.[14] In response to a defense motion, the Court denied the request to preclude the government from arguing to the jury that there was substantive evidence on which the jury might find the defendant to be the owner of Advanced Systems, Inc., but stated that she was confident that the government would not argue in its closing that Shea's prior inconsistent statement constituted substantive evidence. *See* Order of March 3, 1997, at 3. Importantly, the Court did not bar the government from referring to Shea's prior inconsistent statement in order to assess her credibility as a witness nor would it have been proper to do so.

14. The Court instructed the jury as follows:

> During the trial, you heard evidence that Elaine Shea made a statement on an earlier occasion and that this statement may have been inconsistent with her testimony in court. This earlier statement was brought to your attention to help you in evaluating that witness' believability here in court. In other words, if on an earlier occasion the witness made a statement that is inconsistent with her statement in court, you may consider the inconsistency in judging the credibility of the witness at trial. You may not consider the earlier statement as proof of what was said in the earlier statement as true.
>
> It is for you to decide whether a witness made a statement on an earlier occasion and whether it was, in fact, inconsistent with the witness' in court testimony here in order to evaluate the witness' believability here in court.
>
> TR at 3386–87.

15. The defendant's counsel did not object to this specific argument during or after Mr. Sullivan's rebuttal. *United States v. Butler*, 924 F.2d 1124, 1127 (D.C.Cir.), *cert. denied*, 502 U.S. 871, 112 S.Ct. 205, 116 L.Ed.2d 164 (1991); *see United States v. Spriggs*, 102 F.3d 1245, 1259 (D.C.Cir. 1996), *r'hg denied* (Feb. 20, 1997). Counsel did have an opportunity to do so, of course, as evidenced by Mr. Jones' conditional objection on a different point after the government's rebuttal.

In his closing argument before the jury, the defendant's counsel relied upon Shea's redirect testimony as substantive evidence that Advanced Systems was not set up for the defendant:

> Mr. Jones: Ms. Shea, she testified that Advanced Systems, this company was set up for Mr. Fattah. That's her testimony. She didn't testify that it was set up for anybody else. She didn't testify that it was set up for Mr. Neill. She testified that it was set up for Mr. Fattah. That is the evidence.

TR at 3120–21.

In the instant motion, however, the defendant not only challenges the basis of admission of evidence upon which he directly relied in his closing argument, but he now contends that the government violated the Court's confidence by arguing that Shea's prior inconsistent statement constituted substantive evidence.[15] Contrary to the defendant's claim, the government's rebuttal argument did not violate the Court's confidence:

> *See* TR at 3363. The following colloquy makes this clear:
>
> Mr. Jones: All right. Very well. One other thing I wanted to raise, with regard to Mr. Sullivan's rebuttal, something that troubled me a little bit, I didn't want to interrupt him, but he talked about cash withdrawals and attributed them as some sort of false or material misstatement relating to Counts, I think, 3, 4, and 5 or 2, 3, 4, and 5, and those, of course, counts relate only to 1986 and relate only to the DMS transaction. That, I thought, was the government's position. He seemed to be arguing something quite differently from that with regard to the cas[h] payments, which of course, I think the evidence is, is that they're later than '86, as I recall.
>
> So I just wish we could clarify that. I don't know if an additional instruction is necessary, but I think that's what Mr. Sullivan was arguing. If he wasn't, perhaps I'm mistaken.
>
> The Court: Let me hear. He was the arguer.
>
> Mr. Sullivan: I was referring to Count 6, which charges that Denis Neill filed a false tax return for 1989, and I was referring to the cash withdrawals from the Advanced Systems account in 1989, the $45,000.
>
> Mr. Jones: Well, I'll look at—if there's a transcript to be looked at, if it's timely—I am almost positive he mentioned Counts 2, 3, 4, and 5, but that's my job to find that, Your Honor.
>
> TR at 3363–64.

Mr. Sullivan: Remember they were talking about Elaine Shea and Advanced Systems and all that stuff? Well, I impeached Elaine Shea on the stand, and that is one of these fancy lawyer words, legal words, that basically means that when she said something on that stand that was inconsistent with a prior statement, I was able to show you, the members of the jury, that inconsistent statement—not to prove that that out-of-court inconsistent statement was true, only so that you could assess whether or not she was telling the truth when she testified. And Judge Green will instruct you on that.

But here were the questions and answers, and this is where I impeached her with this prior inconsistent statement, and this was on my redirect. She began her direct, if you recall, by, you know, answering some questions, and, again, she was hesitant to really answer questions. You make the call. And she was, again, one of those witnesses that wasn't really being very forthcoming with information. She had a lot of these "I don't recall," "I don't remember." But there's one thing she said that I think you should consider because I think it is damaging testimony as to Denis Neill. I asked her this question—I was talking about Denis Neill. I was asking her about Denis Neill's office and the credenza behind his desk and some corporate books that were behind there:

Question: "Could you list a few that you remember?"

Answer: "Ace Engineering, J & B, Denis Neill PC, Advanced Systems, probably Defense Marketing."

There it is right there. There was the Advanced Systems book right behind Den-

is Neill's credenza in his office, and she worked for Denis Neill during '85 through June of '86, I believe. And that's when Advanced Systems was set up, was in April, May of '86. And that's on one of these charts that I'll get to in a second.

But here's how I impeached her, so listen for that inconsistent prior statement:

Question: "Which client did Denis Neill set up Advanced Systems for?"

Answer: "Kamel Fattah."

Question: "Your answer is Kamel Fattah?"

Answer: "Right."

Question: "Do you remember being interviewed by Special Agent Phyllis Sciacca on June 23, 1994?

Answer: "Yes."

Question: "And did you tell her that Denis Neill set up a corporation called Advanced Systems for himself?"

Answer: "Yes."

Inconsistent testimony when she's on the stand in the presence of the defendants, but on June 23, 1994, she told something else. You can consider that prior inconsistent statement when determining whether she was a credible witness when she said that Denis Neill set up Advanced Systems for himself.

TR at 3332–34.

▮▮▮ The Court rejects the defendant's claim. While the nexus between Shea's testimony and Count Six is not strong,[16] the record nevertheless makes clear that her testimony was properly admitted at trial and properly referred to by *both* sides in their closing arguments to the jury. As the defendant's secretary for the year in which Advanced Systems was established and during the period in which the defendant

---

**16.** It is important to note that Shea was the defendant's secretary from 1981 to 1986 and that the return at issue was first filed in 1989 and amended (twice) in 1991. While Shea's testimony may have been probative as to whether Kamel Fattah was the owner of Advanced Systems, which point the defendant argued in his closing based precisely on Shea's redirect examination (the admission of which he now challenges), the government had to prove beyond a reasonable doubt that the defendant exercised signature or other authority over a foreign bank account.

Without even considering Shea's testimony that may have been probative of ownership (or who Advanced Systems was set up for), substantial evidence was introduced at trial for the jury to find that the defendant exercised (and failed to disclose) signature authority over the foreign accounts at issue in Count Six. Shea's testimony, while of course relevant to Count Six, was more probative to counts on which the jury acquitted the defendant. Nevertheless, while relevant, her testimony did not go to the central issues in Count Six.

maintained a business relationship with the members of the law firm acting as its Board of Directors, the questions by both sides exploring her knowledge of Advanced Systems and the defendant's business activities were proper. Her answers to those questions (even to the same or similar questions by both sides), as this Court has previously noted, varied widely. *See* Order of March 3, 1997, *supra*, at 2. While the defendant now contends that Shea had no personal knowledge regarding Advanced Systems, Inc., her variable testimony (considered in light of her assigned responsibilities) suggests that the truth may have been otherwise. In any event, the government's questions, regarding for whom Advanced Systems was set up, were fair redirect examination. Significantly, as the defendant fully embraced in his closing, the answer to that question ("Kamel Fattah") was a substantive answer that inured to his benefit.[17] The government's impeachment of Shea after she gave that answer and its reference to that impeachment during rebuttal was entirely proper. The argument is rejected.

### The government's arguments regarding the Bermuda bank account.

 Equally without merit is the defendant's contention that the government improperly argued that the funds transferred from the Advanced Systems' account to his Bermuda account "constituted unreported taxable income." Motion for a New Trial at 30. While conceding that the government did not refer to these transfers as unreported income, *see id.* at 29, the defendant did not object to the government's closing argument related to Count Six. Absent an objection at trial, an allegation of improper closing argu-

ment is reviewed for plain error. *United States v. Butler,* 924 F.2d 1124, 1127 (D.C.Cir.), *cert. denied,* 502 U.S. 871, 112 S.Ct. 205, 116 L.Ed.2d 164 (1991); *see United States v. Spriggs,* 102 F.3d 1245, 1259 (D.C.Cir.1996), *r'hg denied* (Feb. 20, 1997).

 Here, the Court instructed the jury it was not to consider those transfers as income and that failure to report those transfers was not to be considered criminal:

> You have also heard evidence that the defendant, Denis M. Neill, received certain sums that were transferred to his Bermuda bank account for his family vacations. There has been a suggestion that those sums may have been income.[18] However, the defense has introduced evidence describing such sums as gifts from Kamel Fattah. The indictment does not charge defendant, Denis M. Neill with any crime in connection with those sums I have just mentioned.
>
> It is, of course, up to you to decide whether or not to accept the evidence that these sums were received at all. If you find that the defendant, Denis M. Neill, received these sums in his Bermuda bank account, then you may consider that evidence only for the limited purpose of demonstrating his control over a foreign bank account. You may not consider this evidence for any other purpose. *The defendant has not been charged with any offense relating to the failure to report such sums and you may not consider this evidence to conclude that its failure to report constitutes a violation of U.S. law.*

TR at 3388–89 (emphasis added).

As this instruction makes clear, the Court instructed the jury that the transfers were

---

**17.** The defendant's counsel did not object to this question when asked on redirect or to the answer when Shea provided it, let alone at that time contend that it should be stricken under Rule 602. Counsel objected only once Shea was impeached with a prior inconsistent statement, moving to strike that answer. *See* TR at 832. Relying on Shea's testimony when it suits his theory, but arguing she lacked personal knowledge when it does not, suggests that the argument in the Motion for a New Trial is somewhat disingenuous.

**18.** The Court used the word "suggestion" because the government conceded that it was not contending that the transfers were income and accordingly did not introduce evidence to establish that proposition. However, the defendant's accountant testified that he was concerned that the transfers might be considered income, raising a "red flag" for the IRS. TR at 686. The phrase "there has been a suggestion" without identifying who offered such a suggestion was selected intentionally to minimize the potential for prejudice to the defendant while recognizing the government's position.

only to be considered for the purpose of demonstrating his control over a foreign bank account. This instruction did not bar the government from referring to those transfers in its closing argument, and the government's rebuttal to the defendant's closing in this regard was entirely proper and supported by the evidence.[19]

**Prejudicial spillover.**

Finally, the defendant contends that his conviction on Count Six was the product of "prejudicial spillover" from other charges in the indictment, "chiefly from the joinder of Count Six with the obstruction of justice allegations." Motion for a New Trial at 35 n. 22. Specifically, he states that the evidence regarding compliance with the Warfield subpoenas and the defendant's testimony before the grand jury in 1991 would not have been admissible at separate trial on Count Six. *See* Motion for a New Trial at 35. This evidence, the defendant argues, was inflammatory and resulted in prejudicial spillover leading to the conviction on Count Six.

■■■■ Under Fed.R.Crim.P. 14, "[i]f it appears that a defendant ... is prejudiced by joinder of offenses ... in an indictment ..., the court may ... grant a severance ... or provide whatever relief justice requires." There is, of course, a preference for joint trials, *United States v. Clarke,* 24 F.3d 257, 262 (D.C.Cir.1994), and the Court has broad discretion whether to grant a severance. *Zafiro v. United States,* 506 U.S. 534, 541, 113 S.Ct. 933, 938–39, 122 L.Ed.2d 317 (1993); *see also United States v. Brown,* 16 F.3d 423, 432 (D.C.Cir.), *cert. denied,* 513 U.S. 900, 115 S.Ct. 257, 130 L.Ed.2d 178 (1994) ("This

court gives district courts great latitude to sever defendants under Rule 14."). A claim of misjoinder or abuse of discretion in failing to sever is normally waived unless timely made. *Brown,* 16 F.3d at 428; *United States v. Brooks,* 957 F.2d 1138, 1145 n. 7 (4th Cir.), *cert. denied,* 505 U.S. 1228, 112 S.Ct. 3051, 120 L.Ed.2d 917 (1992). Absent a timely objection, denial of a severance claim is reviewed only for plain error. *Clarke,* 24 F.3d at 262.

■■■ In this case, the defendant never moved to sever Count Six. While he moved pretrial to sever the Defense Marketing Services' transaction from the Glenbrook transaction and Count Seven, *see* Motion of Defendants' Denis M. Neill and James P. Neill to Sever Offenses Related to Defense Marketing Services, Inc. (filed Apr. 16, 1996) (Docket No. 43), the Court denied that motion, in part because "all indications are that the evidence in this trial can be easily compartmentalized, making severance inappropriate." Mem. Op. and Order at 32 (Nov. 1, 1996) (Docket No. 126) (citing *United States v. Manner,* 887 F.2d 317, 325 n. 7 (D.C.Cir. 1989), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990)). In denying that motion, the Court expressly stated that "the evidence appears to be subject to compartmentalization [and] the potential for prejudicial spillover, if any, could be cured through appropriate jury instructions." Id.

The bottom line is nevertheless clear: the defendant never moved to sever Count Six. In fact, he never uttered a whisper, either before trial or during trial (even when the Court dismissed Count Seven at the close of the government's case), that the joinder of

---

19. In closing, defense counsel argued that Defendant Denis M. Neill lacked a motive to conceal the existence of the foreign accounts at issue in Count Six: "[The Indictment in Count Six] doesn't charge ... a dime of unreported income.... So why would he intentionally not report it? He wouldn't have a motive to do it." TR at 3112; "If there is no tax liability, there is no reason to lie to the IRS. If you have no motive, why would you intentionally file a false return if you don't have a motive to do it? Just a mistake." TR at 3159. To which the government responded:

> The motive based on the evidence that we presented that relates to this 1989 return is clear-cut. Denis Neill didn't want to have the

IRS scrutinizing these foreign transactions. He didn't want to wave the red flag. He didn't want to say yes. He didn't want to truthfully say yes to the question on his Schedule B because he didn't want the IRS to come in and say, "Oh, you do have foreign bank accounts? Why don't you just show me. Why don't you show us what's going on with those accounts." Do you think that Denis Neill wanted the IRS to know that he was authorizing $50,000 to go over to his Bermuda account to pay for his vacation over in Bermuda? Do you think he wanted the IRS to know about that $45,000 he took out in cash during 1989 from the Advanced Systems account?

TR at 3329.

Count Six with the other counts had caused or would cause him to suffer unfair prejudice. Having failed to preserve this claim, it has been waived.

 Even if the defendant had made his motion to sever Count Six timely, the Court would not have granted it, because severance was neither necessary nor appropriate to ensure that the defendant received a fair trial. Nor has he demonstrated that he suffered unfair prejudice due to the fact that the Court did not *sua sponte* sever Count Six. The majority, if not all, of the obstruction evidence relating to Count Seven, of which the defendant chiefly complains, would have been admissible in a separate trial of Count Six, because it is probative of the defendant's motive, plan, knowledge or absence of mistake in failing to report his signature authority over foreign bank accounts. *See* Fed. R.Evid. 404(b). The same is equally true with respect to the conspiracy evidence. Moreover, two of the foreign bank accounts at issue in Count Six were accounts maintained in the name of Warfield, Inc., the focus of the grand jury subpoenas in Count Seven. And, the taped conversation, which was recorded through the use of an undercover informant and admitted at trial, offered evidence of the defendant's motive in concealing information from the IRS. *See* GX 38–1 (tape); Attachment 2 to the Government's Opposition (excerpt of transcript).[20] Simply put, the "inflammatory evidence" to which the defendant now "chiefly" points, is probative of a common plan of concealment—

and, as such, it would be admissible, either directly or under Rule 404(b).

Additionally, when the Court dismissed Count Seven at the close of the government's case, the jury was instructed to "disregard any and all testimony or other evidence which has been introduced only about this charge." TR at 2904. The Court told the jury that such evidence "should not in any way influence your final decision concerning the remaining charges against the defendants." TR at 2904–05. And, after the Court dismissed Count Seven, pursuant to the defendant's request, she carefully considered those exhibits which the defendant contended created unfair prejudice. *See* Corrected Order of March 3, 1997 (ordering that certain "exhibits will remain in evidence because they are relevant to allegations in the Indictment other than the dismissed Count Seven, and their probative value is not substantially outweighed by the danger of unfair prejudice," striking multiple exhibits based on the parties' agreement, and striking one exhibit over the government's objection).

As contemplated when the Court denied the defendant's motion to sever the Defense Marketing Services counts, the Court gave the jury instructions that were intended to cure the potential for prejudicial spillover, if any, between the remaining counts. Consistent with the instruction requested by the defendant, this Court directed the jury to consider each count separately.[21] This Court also advised each juror to read each count in full: "Count 6, which charges defendant,

---

20. Codefendant James P. Neill explained their motivation for concealing matters from the IRS to Kamel Fattah's daughter:

> Your father didn't want anything, he was always afraid that if he had to pay taxes on one thing, that the U.S. Government could say well what about the money he made on other things.

GX 38–1; Transcript of Tape at 11.

Defendant Denis M. Neill made the following statement probative of ongoing concealment from the IRS:

> So the way [Glenbrook Development Corporation] was created was that this company here in the U.S. would be owned separately, not by your father, but, because of me, he was controlling it, he controlled all the decisions of the company, and again that is not something we are supposed to tell the tax people. But, and they have, they have an open tax file investigating this just to let us know.

GX 38–1; Transcript of Tape at 9.

21. The Court stated:

> A [separate] crime is alleged against one or both of the defendants on each count of the indictment[ ]. Each of the defendants has pled not guilty to each of the counts to which he [was] charged pursuant to the indictment. You will have a copy of the indictment in the jury room with you during the course of your deliberations for reference. And indeed, as you will hear through the course of these instructions, I will later tell you to read the indictment in full as to each count.
>
> Unless I tell you otherwise, you should consider each instruction that I have given or will be giving hereafter, to apply separately and individually to each defendant on trial. Likewise, you should give separate consideration and return separate verdicts with respect to each defendant as to each count. Each defen-

Denis M. Neill with making and subscribing a false return is set forth in full at page 19 of the indictment and should be read in full by each juror." TR at 3416. "[J]uries are presumed to follow their instructions," *Zafiro*, 506 U.S. at 540, 113 S.Ct. at 939, and the defendant has not shown that, even if there were a risk of prejudice arising from the joinder of Count Six, it was not cured by the Court's instructions.

The fact that the jury acquitted Defendant James P. Neill of three counts and Defendant Denis M. Neill of five counts indicates not that Denis Neill's conviction on Count Six was the product of "prejudicial spillover" but that the jury was able to compartmentalize the evidence at trial and apply it separately to the individual counts. The precautions undertaken by the Court to blunt the potential for prejudicial spillover were in full accord with the law of this Circuit, *see Clarke*, 24 F.3d at 262, and the defendant's argument is rejected.

### Conclusion

Accordingly, for the reasons stated above, it is hereby **ORDERED** that the Motion for a New Trial is **DENIED.**

IT IS SO ORDERED.

dant is entitled to have his innocence or his guilt as to each of the crimes charged against him determined from his own acts, his own statements, his own conduct and from any other evidence in the case which may be applicable to him as if he were being tried alone. TR at 3377.